UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| HUNG DANG, M.D.,<br><br>　　　　　　　Plaintiff,<br>　　v.<br><br>KIMBERLY MOORE, M.D., et al<br><br>　　　　　　　Defendant(s). | CASE NO. 3:20-cv-06178-MAT<br>[to be filled in by Clerk's Office]<br><br>COMPLAINT FOR VIOLATION<br>OF CIVIL RIGHTS AND<br>EMPLOYMENT<br>DISCRIMINATION<br><br>Jury Trial: ☒ Yes ☐ No |

## I.     THE PARTIES TO THIS COMPLAINT

Plaintiff

| | |
|---|---|
| Name | HUNG DANG, M.D. |
| Street Address | 27222 10TH AVE S |
| City and County | DES MOINES, KING COUNTY |
| State and Zip Code | WA 98198 |
| Telephone Number | |

Defendants

Defendant No. 1

| | |
|---|---|
| Name | KIMBERLY MOORE, M.D. |
| Job or Title (if known) | Vice President for Quality and Associate Chief Medical Officer for Franciscan Health System |
| Street Address | 8414 SE 39TH ST |
| City and County | MERCER ISLAND, KING COUNTY |

| | |
|---|---|
| State and Zip Code | WA 98040 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

Defendant No. 2

| | |
|---|---|
| Name | MARK ADAMS, M.D. |
| Job or Title *(if known)* | Former Chief Medical Officer for FHS |
| Street Address | 2500 Grant Rd |
| City and County | MOUNTAIN VIEW, SANTA CLARA |
| State and Zip Code | CA 94040-4302 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

Defendant No. 3

| | |
|---|---|
| Name | KETUL PATEL |
| Job or Title *(if known)* | Chief Executive Officer for FHS |
| Street Address | 1515 Dock St UNIT 613 |
| City and County | TACOMA, PIERCE |
| State and Zip Code | WA 98402 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

Defendant No. 4

| | |
|---|---|
| Name | FRANCISCAN HEALTH SYSTEM |
| Job or Title *(if known)* | A healthcare public benefit nonprofit corporation |
| Street Address | 1717 S J ST, MS 07-00 |
| City and County | TACOMA, PIERCE |
| State and Zip Code | WA 98405 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

Defendant No. 5

| | |
|---|---|
| Name | ANN CLARK |
| Job or Title *(if known)* | |
| Street Address | 1807 150th St S |
| City and County | SPANAWAY, PIERCE |
| State and Zip Code | WA 98387 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

Defendant No. 6

| | |
|---|---|
| Name | SYDNEY BERSANTE |
| Job or Title *(if known)* | President, St. Joseph Medical Center |
| Street Address | 3202 Loma Ct NE |
| City and County | TACOMA, PIERCE |
| State and Zip Code | WA 98422 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

Defendant No. 7

| | |
|---|---|
| Name | YANLING YU |
| Job or Title *(if known)* | MQAC member |
| Street Address | 3941 NE 158th Ln |
| City and County | LAKE FOREST PARK, KING |
| State and Zip Code | WA 98155 |
| Telephone Number | |
| ☒ Individual capacity | ☒ Official capacity |

Defendant No. 8

| | |
|---|---|
| Name | WARREN HOWE |
| Job or Title *(if known)* | MQAC member |
| Street Address | 4222 Northridge Way |
| City and County | BELLINGHAM, WHATCOM |
| State and Zip Code | WA 98226 |
| Telephone Number | |
| ☒ Individual capacity | ☒ Official capacity |

Defendant No. 9

| | |
|---|---|
| Name | MARK JOHNSON |
| Job or Title *(if known)* | MQAC member |
| Street Address | 402 S 9th St |
| City and County | MOUNT VERNON, SKAGIT |
| State and Zip Code | WA 98274 |
| Telephone Number | |
| ☒ Individual capacity | ☒ Official capacity |

Defendant No. 10

| | |
|---|---|
| Name | WILLIAM M. BRUEGGEMANN |
| Job or Title *(if known)* | MQAC member |
| Street Address | 40 Brown Ln S |
| City and County | SELAH, YAKIMA |
| State and Zip Code | WA 98942 |
| Telephone Number | |
| ☒ Individual capacity | ☒ Official capacity |

Defendant No. 11

| | |
|---|---|
| Name | RICK J. GLEIN |
| Job or Title *(if known)* | MQAC staff attorney |
| Street Address | 5417 Kirkwood Place N |
| City and County | SEATTLE, KING |
| State and Zip Code | WA 98103 |
| Telephone Number | |
| ☒ Individual capacity | ☒ Official capacity |

Defendant No. 12

| | |
|---|---|
| Name | ROMAN S. DIXON Jr. |
| Job or Title *(if known)* | Administrative health law judge |
| Street Address | 1624 S Cushman Ave |
| City and County | TACOMA, PIERCE |
| State and Zip Code | WA 98405 |
| Telephone Number | |

☒ Individual capacity      ☒ Official capacity

Defendant No. 13

| | |
|---|---|
| Name | DEBRA L. DEFREYN |
| Job or Title *(if known)* | Assistant Attorney General |
| Street Address | 8929 Windham Ct NE |
| City and County | LACEY, THURSTON |
| State and Zip Code | WA 98516 |
| Telephone Number | |

☒ Individual capacity      ☒ Official capacity

Defendant No. 14

| | |
|---|---|
| Name | CHRISTINA PFLUGER |
| Job or Title *(if known)* | Assistant Attorney General |
| Street Address | 2842 Coventry Ln Sw Apt 2815 |
| City and County | TUMWATER, THURSTON |
| State and Zip Code | WA 98512 |
| Telephone Number | |

☒ Individual capacity      ☒ Official capacity

Defendant No. 15

| | |
|---|---|
| Name | TIMOTHY H. SLAVIN |
| Job or Title *(if known)* | MQAC Investigator |
| Street Address | 14627 Knowles Rd SE |
| City and County | TENINO, THURSTON |
| State and Zip Code | WA 98589 |
| Telephone Number | |

☒ Individual capacity      ☒ Official capacity

Defendant No. 16

| | |
|---|---|
| Name | ANN SCHINDLER |
| Job or Title *(if known)* | WA State Court of Appeals Judge |
| Street Address | 8001 Ridge Drive NE |
| City and County | SEATTLE, KING |
| State and Zip Code | WA 98115 |

Telephone Number

☐ Individual capacity   ☒ Official capacity

Defendant No. 17

Name                          MARLIN APPELWICK

Job or Title *(if known)*      WA State Court of Appeals Judge

Street Address                9112 17th Ave NE

City and County               SEATTLE, KING

State and Zip Code            WA 98115

Telephone Number

☐ Individual capacity   ☒ Official capacity

Defendant No. 18

Name                          J. ROBERT LEACH

Job or Title *(if known)*      WA State Court of Appeals Judge

Street Address                5733 Sunset Ln

City and County               MUKILTEO, SNOHOMISH

State and Zip Code            WA 98275

Telephone Number

☐ Individual capacity   ☒ Official capacity

## II.     NATURE OF THE CASE

1. This is an action for damages and injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 based upon the continuing violations of Plaintiff's rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, Washington State Civil Rights Act RCW 49.60.030, Washington State Administrative Procedure Act RCW 34.05, and Washington State Uniform Disciplinary Act RCW 180.130.

2. This is also an employment discrimination case, brought pursuant to the provisions of the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991

("Section 1981"), Consumer Protection Act RCW 19.86 and Washington State Civil Rights Act RCW 49.60.030.

3.      Additionally, because the private defendants acted in concert with the state defendants in furtherance of a conspiracy to deprive Plaintiff of equal privileges and immunities under the US Constitution and 42 U.S.C. §1981, this action also is for damages and injunctive and declaratory relief pursuant to 42 U.S.C. § 1985 and RCW 19.86 whereby Plaintiff's medical license and professional standing and reputation in Washington and Oklahoma states are severely damaged and Plaintiff's rights and privileges of a citizen of the United States deprived.

### III.      JURISDICTION AND VENUE

4.      Original Jurisdiction of this Court exists pursuant to 28 U.S.C. § 1331 and 1343 based on 42 U.S.C. §1983, 1981, and 1985(3) and questions of federal constitutional law. Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. Supplemental jurisdiction over Plaintiffs' state law claims is pursuant to 28 U.S.C. §1367.

5.      Venue is proper in the Western District of Washington State in Tacoma in that the events and conduct complained of herein all occurred in Pierce and Thurston Counties of the Western District.

### IV.      STATEMENT OF THE CASE

6.      Plaintiff alleges that as a result of being an immigrant Asian American and engaging in protected speech and expression, I was illegally harassed, subjected to a pattern of unwelcome racial harassment and disparate treatments, and knowingly subjected to unjustified and factually unsupported disciplinary actions by both private Defendants and

state Defendants in a series of concerted action or conspiracy designed to improperly

stifle my speech and deprive me of due process, equal protection under the law, and

privacy against intrusions by MQAC officials guaranteed by the US Constitution as well

as the right to make and enforce contract according to 42 U.S.C. § 1981.

7.   I was born and raised in Vietnam but fled its oppressive communist regime for the USA

in 1992 as a political refugee at the age of 20 with my family to realize my dream of

becoming a physician. I became a naturalized Asian American citizen at the age of 30.

Growing up, I witnessed first-hand the injustice of my father's 8-year imprisonment in

concentration camps without any due process of the law. After overcoming many

seemingly insurmountable obstacles, I graduated *summa cum laude* from the University

of Oklahoma College of Pharmacy in 1998 and then with honors from the University of

Oklahoma College of Medicine in 2003. I finished my otolaryngology training in

Oklahoma in 2008 and accepted a staff otolaryngologist position with Group Health

Permanente (GHP) Otolaryngology practice in Tacoma, WA. I got my license to practice

medicine in WA state in August 2008 and then my Board of Otolaryngology certification

in 2010. Up to the time of my adjudicative proceeding, I had never had any federal or

state law violation or disciplinary action of any type. The Final Order clearly stated "no

prior discipline" as one of the mitigating factors in its Conclusion of Law (COL) 2.12.

Neither have I ever been sued or settled for medical negligence or malpractice.

8.   My "confidential" employment contract with GHP dated June 11th, 2008 reads, "As a

condition of initial and continued employment, Practitioner has obtained (or shall obtain

before the Employment Commencement Date) and shall maintain at all times during his

employment with GHP:

> 6.1 A full and unrestricted license to perform the professional duties of the
>
> position … in the State of Washington;
>
> …
>
> 6.4 Credentials …, and clinical privileges at all non-GHC facility(ies) at which
>
> GHP requires Practitioner to maintain clinical privileges."

9.   Founded in 1947, Group Health Cooperative (GHC) was a consumer-governed, nonprofit health care system that coordinates care and coverage. Based in Seattle, Group Health and its subsidiary health carriers, Group Health Options, Inc. and KPS Health Plans, served more than half a million residents of Washington state and Idaho before it was acquired by Kaiser Permanente on February 1st, 2017.

10.   At all times relevant herein, GHC did not operate any local hospital and thus contracted with the Franciscan Health System (FHS) as its provider of acute-care services for Group Health clients and members in the South Sound since 1996. To date, most admissions of Group Health enrollees for inpatient care in the South Sound have occurred at St. Joseph Medical Center (SJMC), the flagship hospital of FHS in Tacoma.

11.   GHP Otolaryngology Practice/Group included three otolaryngologists employed by GHP to serve GHC members at the Group Health Tacoma Specialty Center. I was employed to start in September 2008 and thus was the most senior member of the group. Dr. Moreano was employed in May 2011 while Dr. Deem started in October 2012. Drs. Moreano and Deems are neither Asian nor immigrant. Neither do they speak English with an accent. Their names, Alex Moreano and Kenneth Deem, do not sound foreign like my name.

12.   Defendant Franciscan Health System (FHS) was at all times relevant herein a Washington professional services 501(c)(3) corporation with its principal place of business in Tacoma, Pierce County, Washington. Nevertheless, at all times relevant to

this case, Defendant Franciscan Health System was and is jointly and severally liable for the errors and omissions of its employees, directors, officers, and agents as respondeat superior and/or pursuant to RCW 18.100.070.

13. The FHS was registered and incorporated in Washington State and owns multiple hospitals throughout the Puget Sound area. Each of these hospitals is an independent entity and has its own Medicare provider number.

14. Since GHC did not operate any local hospital, I was required to obtain and maintain staff membership at St Joseph Medical Center (SJMC), the flagship hospital of the FHS. I have never agreed to be a representative or agent for any hospital within the FHS, including SJMC. Neither have I been employed by SJMC or FHS.

15. In exchange for this medical staff membership at SJMC, I agreed to take emergency ENT calls *only* for *unassigned* patients at the Emergency Department (ED) of SJMC campus on a regular basis *without* any financial compensation. I *never* agreed to cover all ED patients for the entire FHS. This is consistent with the FHS Medical Staff Bylaws and its Rules and Regulations (Article II Section 1C and Section 10, respectively).

16. At all times relevant to this matter, the FHS owned the Franciscan Ear, Nose & Throat Associates (FHS ENT practice/group) and employed many otolaryngologists, who contractually had to take calls for the entire health system. Dr. Souliere was the chief of the FHS ENT practice. At all times relevant herein, there was always a Franciscan otolaryngologist (FHS ENT) on call contemporaneously and simultaneously whenever I was on community call because I never agreed to cover for any patient of their practice. Likewise, the otolaryngologists employed by the FHS did not have to cross-cover for GHP Otolaryngology practice.

17. FHS Medical Staff Bylaws Article II, Section 1.A.6 states, "All practitioners shall reside and practice in sufficient proximity to the Campus to insure that any patient under the care and supervision of such practitioner will receive continuous care consistent with their expected needs, especially in the case of emergencies." Due to this requirement, GHP Otolaryngology practice and Franciscan Ear, Nose & Throat Associates did not cross-cover for their respective practice patients, especially in cases of emergencies.

18. Soon after my employment and in spite of these formal rules and verbal agreements, I started getting calls from the ED's of other outlying Franciscan hospitals in the Puget Sound area, including St Francis hospital (SFH) in Federal Way, St Clare hospital (SCH) in Lakewood, St Anthony hospital (SAH) in Gig Harbor, St Elizabeth hospital (SEH) in Enumclaw, and then later Harrison Medical Center in Bremerton. Sometimes, my GHP practice partners and I even got calls about patients belonging to the Franciscan Ear, Nose & Throat Associates. On multiple occasions over several years, my GHP ENT partners and I have raised issues about the burden of covering multiple ED's within the ever-expanding Franciscan Health System with the FHS administration as well as my employer, Group Health Permanente. We had to repeatedly tell these other hospitals that GHP ENT group was not on call for them and that the FHS ENT group was.

19. On September 29th, 2011 an "incident report" alleged that I refused to consult on a patient with a neck abscess at the ED of St Clare Hospital, where I did not practice or apply for medical staff membership. Thus, I and GHP administrators emailed Dr. Tony Haftel, the FHS Vice President (VP) for Quality and Associate Chief Medical Officer (ACMO), to clarify this issue. In his reply on October 5th, 2011, he stated, "Dr. Dang is very correct. When your (ENT) is on call it is for SJ ER only. The SCH ER has been hanging the FHS call schedule for ENT on their wall, which clearly identifies that 'GH' when on call, is on

call for SJ ER only." He then reiterated, "We have now made it clear to our EDs that

when you or any other GH ENT doc is on call, they are as the schedule states on call for

the SJH ER." Defendant Kimberly Moore was also included in this email thread.

20. Because of this same "incident report," Dr. Charles Souliere, the chief of the Franciscan

Ear, Nose & Throat Associates, clarified in his email dated October 9th, 2011,

> "FMG [Franciscan Medical Group] ENT docs are, in effect, required to cover all
> FHS hospitals, even though we do not work at SFH, SCH, or SEH (while there
> are private ENT practioners [sic] at these hospitals who take no ED call).  We
> have no choice as we are FHS employees.  Group Health ENT docs, however, are
> not FHS employees, and should not be held to the same
> requirements.  Traditionally, community call is taken only at hospitals in which
> one practices, and this is a reasonable expectation for the Group Health
> docs.  Since these docs only practice at St Joes, any call coverage they provide to
> other FHS hospitals would seem to be voluntary."

21. This incident report revealed the unsolved problem with ENT coverage for the FHS

ED's. Even the former Chief Medical Officer (CMO), Dr.  Gregory G. Semerdjian,

admitted as such in his October 10, 2011 email and promised a solution,

> "Colleagues,
> First of all I want to thank you all for the great support you have
> given to FHS over the years.  We are trying to sort through this issue
> of call and want to assure you that we take this responsibility very
> seriously.  We are conducting data gathering as of this writing and will
> get back with everyone as soon as this is complete, hopefully before the
> end of this week.  I apologize for all the email traffic on this call
> issue but it has uncovered some flaws that we need to deal with.  Thank you for
> your patience."

22. For many years, my GHP ENT practice partners and I had tried to address the burden of

calls with FHS administrators, who were well aware of the issues but took no definitive

action. We repeatedly reiterated that GHP ENT physicians were only on call for the ED

at SJMC and not for all ED's within its vast health system. Defendant Kimberly Moore,

as one of the FHS administrative officers, was well aware of this agreement and all its

related ENT call coverage issues.

23. When the increasing burden of FHS ED calls started to disrupt our own practice and livelihood, my partners and I, with the support of GHP administrators, decided to strictly limit our call coverage to just SJMC. We informed the FHS administration including Defendant Kimberly Moore around April of 2014 that the FHS-employed ENT group should cover for the rest of the FHS since they were on call simultaneously.

24. Defendant Moore subsequently met with our medical director to convince us to provide coverage all ED's of the entire health system until the FHS can find a more permanent solution to call coverage issues. We respectfully declined because the FHS administrators had been unwilling to solve their inadequate ENT coverage for many years. They had no incentive to solve this issue because they did not want to pay for additional ENT coverage at other outlying hospitals.

25. In February of 2014, I fractured my upper left arm but fortunately did not need surgery for it. While my left arm healed, I had significant limitations in its range of motion from this injury. Soon after this injury, I avulsed my right Achilles tendon and had to undergo surgical repair at the end of February 2014. After surgery, I was immobilized in a cast for 4 weeks and was placed on non-weight bearing restrictions until the middle of June of 2014. For rehabilitation and physical therapy, I was allowed to only walk or run in a pool. I managed to work instead of taking an extended medical leave to rehabilitate these 2 orthopedic injuries. I had to limit my surgical caseloads due to my decreased leg strength and mobility. Still, I continued to take ENT calls for SJMC without demanding any special accommodation.

26. On Sunday June 8th, 2014 around 4 PM I slipped and fell getting out of the pool at my local gym after my physical therapy. My orthopedic injuries got aggravated and caused severe acute pain. All I could think about was to take some pain medication and lie down

to rest. While trying to use my crutches to get to my bedroom upstairs, I realized I could barely lift my left arm to shoulder level without pain. So, I took one tablet of my prescribed pain medication as well as ibuprofen to help ease the pain in my arm and leg. I lay down to rest in my bed when my pager went off. I telephoned the ED at St Clare Hospital (SCH) in a timely manner after receiving the page.

a.  Ms. Allen, a physician assistant working at the ED at SCH, asked me to evaluate her stable patient with tonsillar abscess. I informed her that I was not on call at SCH and that she should contact the FHS-employed ENT physician on call. When she offered to transfer the patient to SJMC, I explicitly declined because I did not have the physical capacity to care for that patient due to my orthopedic injuries. I took no explicit or implicit action to offer treatment advice or recommendations or to create a patient-doctor relationship with this person (Patient C). There was no pre-existing professional relationship between me and this person either.

b.  After this conversation with Ms. Allen, I went back to sleep and was awakened by another page at around 7:30 PM. When I called back, Dr. Cohen at SJMC ED told me that my patient with tonsillar abscess from SCH had arrived. I informed her that I did not accept that patient because I did not have the physical capacity to safely and effectively take care of a peritonsillar abscess. It turned out that Dr. Kimberly Moore, a board-certified emergency physician and the on-call associate Chief Medical Officer of the FHS, accepted that patient for transfer. This is an undisputed finding of fact in MQAC's Final Order and Amended Final Order.

c.  Defendant Moore never contacted me or Ms. Allen to find out the reasons for my refusal to accept that patient. When I called Dr. Moore about this patient, she confirmed that she accepted the patient for transfer. I advised Dr. Moore to care

for this patient since she is a board-certified emergency physician. Alternatively, she could contact the FHS ENT group, which was on call contemporaneously for Franciscan patients if she herself could not. I declined to be Dr. Moore's substitute because I was not physically capable to drain an abscess at the time.

d.    Defendant Moore, a board-certified emergency medicine physician, was trained and experienced in needle aspirations, including needle aspiration of tonsillar abscesses. She accepted Patient C for transfer and owed a duty to care for him at SJMC. However, she declined to do so. Patient C was ultimately transferred to Madigan Medical Center and treated successfully there without any complications. She herself violated EMTALA and abandoned her own patient but was not investigated by MQAC because she is white.

27.    Because of this incident in ¶26, on June 16th, 2014, Defendants Ann E. Clark, Kimberly Moore, Sydney Bersante, and Julie Burns from SJMC, acting as complainants, self-reported a "potential EMTALA violation" occurring on June 8th, 2014 to the CMS Division of Survey and Certification. Exhibit 1. These defendants' motive was to retaliate against my refusal to accept "Patient C" and to discriminate racially against me. They confidently believed that I would be found in violation of EMTALA. They had also hoped that a "self-report" would be viewed positively by the CMS investigator. They also wanted to set an example out of me so that I would stop pushing back on their demands to cover all the ED's within their expansive health system for free.

28.    On June 17th, 2014, Defendant Kimberly Moore emailed this self-reporting letter to my supervisors at GHP, which was forwarded to me.

29.    On July 9th, 2014, CMS sent an investigator to SJMC to review the medical records and conduct interviews with all involved parties. I was scheduled to be interviewed in person

after her interviews with the FHS staff. However, the investigator finished early and asked if I could meet with her in person early. I was in my clinic seeing patients and could not meet with her in person. She then interviewed me over the phone and decided to take no action against me regarding this self-reported "potential EMTALA violation."

30. On July 17th, 2014, Defendants Adams and Moore in their role as executives of the FHS summoned me for a meeting at the SJMC administration office because the CMS investigator did not need to meet with me in person and did not take any administrative action against me. At this meeting, I again told them that I only had an obligation covering the ED at SJMC and not the entire FHS. They accused me of violating EMTALA even though the CMS investigator took no action against me. They then threatened me that they would take action against my medical staff membership if I continued to be vocal about the on-call issues. They and the entire FHS administration knew that my professional livelihood and employment contract with GHP would be in peril without my medical staff membership at SJMC.

31. While CMS did not pursue any administrative action against me after its formal investigation, its investigator found that SJMC itself violated EMTALA. Specifically, according to the public announcement by the FHS Chief Medical Officer, Defendant Mark Adams, "St. Joseph Medical Center did not provide necessary stabilizing treatment for the patient, and did not have defined in the CHI Franciscan Health Medical Staff Bylaws who is qualified to perform a medical screening exam. CMS will revoke St. Joseph Medical Center's participation in the Medicare program unless the organization corrects these deficiencies." SJMC had to come up with a plan of corrective action to avoid sanction from CMS.

32.    Up to this day, CMS has taken *no* action against me in this matter. Because their plan of self-reporting "a *potential* EMTALA violation" backfired and placed their Medicare certification and participation at risk for future violation, the FHS administrative and executive leaders were angry at me and went on a witch hunt to retaliate against me solely on account of my race. They singled me out for racial discrimination and unwelcome harassment, creating a hostile work environment for me. On information and belief, my two GHP ENT partners refused consults from outlying hospitals but were not subjected to this kind of treatment because they are not Asians.

33.    Even after CMS ultimately concluded that it was FHS that violated EMTALA, Defendant Moore continued to engage in inappropriate patient transfers. In my email to the Defendant on September 10, 2014, I indicated that I would report another EMTALA violation to CMS. Because of the existing EMTALA violation in June, FHS was fearful of having their Medicare certification revoked by CMS. Defendants Moore and Adams set in motion their concerted efforts and actions with MQAC members and staff to violate my constitutional rights to free speech, due process, and equal protection under the law guaranteed by the US Constitution as well as my right to make and enforce employment contract per 42 U.S.C § 1981 as described below.

34.    On May 18th, 2015, a patient of Dr. Sorenson (an otolaryngologist employed by the Franciscan Ear, Nose & Throat Associates) presented with neck swelling after Dr. Sorenson removed a drain from her neck abscess. On information and belief, the ED physician at SJMC contacted Dr. Sorenson's service (Dr. Kennedy) and was told that "they were not on call for the ED." He then contacted me after 30 minutes of "multiple pages to Dr. Sorenson without response." I informed the ED physician that GHP ENT and FHS ENT groups did not cross-cover for each other's patients and advised him to

contact the answering service for Dr. Sorenson to find out who was on call for Dr. Sorenson's patients. *See* ¶¶16-17. Realizing that Dr. Kennedy initially refused to take care of Dr. Sorenson's patient, I went out of my way to contact Dr. Sorenson's answering service and asked them to page Dr. Kennedy urgently since he was on call for Dr. Sorenson's patients. On information and belief, Dr. Kennedy finally called the ED at SJMC to take care of this patient. An incident report was filed on May 27th, 2015. The reviewer of this incident report determined "No deficiency of care" after having all the background information regarding this case. Nevertheless, the FHS administration conducted a sham peer review of my refusal to accept care of this patient even after their own otolaryngologist employee concluded "No deficiency of care." The sole reason for this action was racial animus, discrimination, and harassment and retaliation with the ultimate intent to impair my medical license and employment contract.

35.   On information and belief, Dr. Kennedy, who was on call for Dr. Sorenson but refused to take care of Dr. Sorenson's patient initially, was not subject to any peer review or administrative action by the FHS to my knowledge. Dr. Kennedy is white while I am an Asian American with a Vietnamese accent.

36.   After this sham peer review on August 15th, 2015, the FHS singled me out for more discrimination and forced me to sign an attestation promising that I would agree to accept care for every patient that they asked me to "regardless of the site of patient entry into CHI Franciscan Health and/or prior affiliation or treatment relationship." Exhibit 2. This was contrary to our previous agreement and the FHS Medical Staff Bylaws. I faced the threat of immediate revocation of my medical staff membership and ultimately the loss of my professional livelihood and employment. To protect my professional livelihood and employment with GHP, I had no option but to sign this attestation on September 28th,

2015 in order to maintain my medical staff membership at SJMC. Meanwhile, no other otolaryngologist with medical staff membership at SJMC had to sign such attestation. Racial animus, discrimination, and retaliation again were the reason for FHS coercing me to sign this attestation.

37. I informed my employer all of these racial discriminatory actions and sham peer review by FHS, including this demand for Call Coverage Attestation Agreement. I was warned by my employer that my employment agreement would be terminated if I did not sign this attestation. Therefore, I was coerced into signing it to prevent being fired by my employer. Meanwhile, I tried to work out a separation agreement with my employer. I notified my partners at GHP ENT practice of my intention to resign from my post on September 27th, 2015 just before I had to sign the attestation. Neither of them was asked to sign such an attestation.

38. When my attempt to negotiate a separation agreement with my employer GHP failed in October 2015, I continued to work and obey the demands of the Call Coverage Attestation Agreement. However, my work environment became increasingly more hostile and stressful. At times, I had to cancel half of my schedule at GHC clinic to attend to the FHS ED requests for "emergent ENT" service. Because of the Call Coverage Agreement, I basically had to promptly stop my scheduled clinical responsibilities at GHC to attend to all requests from FHS ED's or risk my medical staff membership being suspended and my professional livelihood ruined. I managed to last until the constructive termination of my employment agreement with GHP. I officially resigned from my position on August 1st, 2017 because of increasingly hostile work environment.

39. The Call Coverage Attestation Agreement signed by Dr. Adams and myself (Exhibit 2) actually altered the conditions of my employment. The Medical Staff Bylaws only

required on call coverage for "*unassigned* patients" at the campus of my practice, which was SJMC. I was previously reassured of this requirement by multiple FHS administrative leaders and the Franciscan Ear, Nose and Throat Associates chief in writing. To my knowledge, I was the only one otolaryngologist who was coerced into signing this agreement in order to avoid termination of my medical staff membership and suspension of my admitting privileges at SJMC.

40.   To this day, CMS and the US Department of Health and Human Services (DHHS) never took any administrative action against me for any alleged EMTALA violation.

41.   EMTALA is a non-discrimination federal statute, making emergency care available to everyone regardless their ability to pay. The statute imposes a legal obligation on *hospitals* that participate in Medicare and operate an emergency department to provide appropriate medical screening and stabilization care to persons presenting themselves to the emergency room with an emergency medical condition or in active labor. Violations of EMTALA may result in monetary penalties of not more than $50,000 (or not more than $25,000 for hospitals with less than 100 beds) for each violation. Administrative enforcement of EMTALA and adjudication of a claim of potential EMTALA violation must follow the provisions of 42 U.S.C. § 1320a–7a, which plainly establishes the exclusive subject matter jurisdiction within the US Department of Health and Human Services. EMTALA does not establish a national standard of care. Neither is the statute a remedy for federal malpractice actions against physicians. Also, the statute does not define an EMTALA violation as unprofessional conduct.

42.   This "self-reporting" letter from Defendants Ann E. Clark, Kimberly Moore, Syd Bersante, and Julie Burns to CMS eventually was forwarded to the Washington State Medical Quality Assurance Commission (MQAC). The FHS Defendants' motive was to

retaliate against me on account of my race for my verbal refusal to accept inappropriate transfers from other hospitals of their health system and for my vocal opposition to their unfair and abusive business practice. They set in motion a "meeting of the minds" and concerted action with MQAC members and staff to tarnish my professional standing and medical license as well as to deprive me of the constitutional rights to free speech, due process, equal protection under the law, and privacy against arbitrary invasions by governmental officials guaranteed by the US Constitution and my right to make and enforce contract, 42 U.S. Code § 1981.

43. This letter plainly stated, "The purpose of this letter is to notify you of **a potential EMTALA violation** that occurred at St. Joseph Medical Center (SJMC) on June 8, 2014." There was no complaint of unprofessional conduct. The controversy was "a *potential* EMTALA violation" for which the controlling and governing statutes are 42 U.S.C. § 1395dd(d)(1)(B) and § 1320a–7a. MQAC is not a court of general jurisdiction and may not adjudicate such claim of "a potential EMTALA violation". In fact, MQAC is a mere *state* administrative agency with extremely limited jurisdiction.

44. Defendant Timothy H Slavin, an investigator from MQAC, contacted Defendant Ann E. Clark for more information.

45. On July 17th, Defendant Clark on behalf of the other defendants of the FHS administration went on a witch hunt to find four (4) other cases from 2011 to 2013. All of these cases were from the ED's of outlying hospitals of the FHS where I did not apply for medical staff membership and admitting privilege or agree to provide on-call coverage. Just like "Patient C," none of these patients had an existing patient-doctor relationship with me. While these FHS defendants never self-reported these cases to CMS as possible EMTALA violations, Defendant Clark reported them to Defendant Slavin as such with

the illegitimate motive of retaliating and racially discriminating against me. Knowing that

my medical license is my professional and employment livelihood, these FHS defendants

conspired with MQAC members and staff to violate my right to "make and enforce" my

employment contract, which did not include the unfair and unreasonable demands to

cover for all ED's within their expansive health system free of charge. 42 U.S. Code

§ 1981. These FHS defendants set in motion a series of concerted acts by MQAC officials

and staff, which they knew would cause injury to my medical license and ability to obtain

employment as well as harms on my constitutional right to free expression of my opinion

about the appropriateness of these requests for patient transfers. On information and

belief, they conspired with MQAC members and staff to silence my vocal opposition to

their demand for free coverage for every single ED of their expansive health system and

to submit to their unreasonable and unfair demands. The sole reason is racial animus,

discrimination, and harassment.

46.  Both the FHS defendants and MQAC officials did not like the communicative content

and viewpoint of my "refusal" to accept inappropriate requests for patient transfers and

my verbal and written objection to FHS demand to provide free coverage for every ED

and thus conspired to censor and stifle my First Amendment right. Viewpoint

discrimination is an "egregious form of content discrimination" and is "presumptively

unconstitutional." *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 829-

830, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

47.  Defendant Slavin reportedly sent me two letters requesting my written response to the

allegation of a possible EMTALA violation on August 11th, 2014 and again on August

25th, 2014. Absent in these letters advising me of his "preliminary investigation" were

important statements mandated by the Uniform Procedural Rules of the Uniform

Disciplinary Act RCW 18.130.095(2)(a) (emphasis added).

> (2) The uniform procedures for conducting investigations shall provide that **prior to taking a written statement**:
> (a) For violation of this chapter, the investigator shall inform such person, in writing of: (i) The nature of the complaint; (ii) that **the person may consult with legal counsel at his or her expense prior to making a statement**; and (iii) that **any statement that the person makes may be used in an adjudicative proceeding** conducted under this chapter

This violation of RCW 18.130.095(2)(a) is also a violation of my constitutional rights to

due process and equal protection of the laws guaranteed by the Fifth and Fourteenth

Amendments.

48.     In a rush to meet Mr. Slavin's deadline (3 days from August 25th, 2014), I responded on

September 2nd, 2014 and denied breaking any rule or law without consulting my attorney,

and without knowing that "any statement that the person makes may be used in an

adjudicative proceeding."

49.     On information and belief, Defendant William Brueggemann[1] was assigned as the

Reviewing Commissioner Member (RCM) on September 17, 2014. He is an emergency

physician and knew that EMTALA is a federal statute, which specifies clearly and

explicitly that claims of "potential EMTALA violation" must be investigated and

adjudicated pursuant to 42 U.S.C. § 1320a–7a. He and MQAC members knew or should

have known that MQAC does not have subject matter jurisdiction over such claims. Yet,

---

[1] "Governor Inslee appointed Dr. William 'Marty' Brueggemann, Jr. to the Medical Commission in November 2013, representing the Fourth Congressional District. Dr. Brueggemann is a graduate of Western Washington University where he earned a B.S. in Human Biology, and the Medical College of Wisconsin. He is board certified in Emergency Medicine, and has worked at Yakima Valley Memorial Hospital for almost a decade."

Medical Quality Assurance Commission Update Vol. 4, Spring 2014. Available at https://www.doh.wa.gov/Portals/1/Documents/3000/658-002(March2014).pdf

they continued to act with clear absence of EMTALA subject matter jurisdiction. On

information and belief, as a practicing emergency physician from a small city in Yakima

County, Dr. Brueggemann faced numerous refusals for transfers and thus used this case

and his power as a MQAC member to set an example.

50.    On information and belief, my case was presented to a panel on October 3rd, 2014 when

the MQAC panel authorized to "expand investigation." The investigation appeared to

continue until early November 2014. By this time CMS had already completed its timely

investigation and actually found that "St. Joseph Medical Center did not provide

necessary stabilizing treatment for the patient, and did not have defined in the CHI

Franciscan Health Medical Staff Bylaws who is qualified to perform a medical screening

exam. CMS will revoke St. Joseph Medical Center's participation in the Medicare

program unless the organization corrects these deficiencies." I was never a subject for

further investigation and administrative proceeding by CMS. MQAC knew or should

have known this information and thus should have stopped its unreasonable investigation

for lack of probable cause. Still, MQAC members continued their witch hunt and pursued

this allegation of a "potential EMTALA violation" on account of racial animus and

discrimination because I have a foreign sounding name, Hung Huy Dang.

51.    On information and belief, my two ENT colleagues at GHP refused inappropriate

transfers from outlying FHS just like I did but faced no such action by the FHS

administrators or MQAC members. But for my race, I would not have been subjected to

such unreasonable prosecution, unwelcome harassment, and intentional discrimination.

52.    On information and belief, MQAC voted to issue Statement of Allegations and

Stipulation to Informal Disposition (STID) on or around November 20th, 2014 even

though MQAC clearly lacks EMTALA subject matter jurisdiction to independently

adjudicate the claim of "a potential EMTALA violation." Yet, I did not hear back from the Commission until May 1st, 2015 when the Commission served its Statement of Allegations and Summary of Evidence as well as its Stipulation to Informal Disposition (STID).

53.   According to WAC 246-16-020(5), ""Patient" or "client" means an individual who receives health care from a health care provider." However, neither person "A", "B", nor "C" in the STID and subsequently the Statement of Charges, Final Order, and *amended* Final Order had ever received any health care from me to be considered my "patient." Therefore, I never owed them any duty of care or obligation to accept their transfers from outlying hospitals where I had no medical staff membership or admitting privileges. These allegations, charges, and subsequently conclusions of law that I violated the standard of care are baseless and conclusory and violated my constitutional rights to free speech, due process, privacy against intrusions by MQAC officials, and equal protection under the law guaranteed by the US Constitution.

54.   On June 22nd, 2015, Drs. Ken Deem and Alex Moreano, my practice partners from the GHP Otolaryngology group, attested to the existence of an ongoing issue with on-call coverage for SJMC and FHS. Exhibit 3. Dr. Moreano attested under penalty of perjury, "I have, in the past, taken the position that I was not required to consult on patients from outlying FHS campuses while on community call. In part because of FHS' treatment of Dr. Dang in this matter, I no longer take that position and consult on all FHS patients during my community call." Exhibit 3. On information and belief, each and every one of us decided to stop taking calls and refuse consults from ED's of other outlying FHS hospitals. We only stopped the refusals after the self-report of "a potential EMTALA violation" by the FHS defendants. Nevertheless, on account of my race, both the FHS

defendants and MQAC officials singled me out for discriminatory actions, harassment, and prosecution. My two practice partners who are not of the Asian race did not have to endure such treatment.

55. On July 14th, 2015, my attorney requested a settlement conference with the reviewing commission member (RCM), Defendant Brueggemann. On July 15th, 2015, the Commission's staff attorney, Defendant Glein, denied this request because "The RCM's time is very valuable and I will not interrupt him unless I can present him some kind of written counteroffer from Dr. Dang." This is a violation of RCW 18.130.098(3), which is also violation of my constitutional rights to due process and equal protection of the laws guaranteed by the Fifth and Fourteenth Amendments.

56. Subsequently, MQAC issued its Statement of Charges on March 30th, 2016. On April 4th, 2016, MQAC served an unsigned Corrected Statement of Charges, stating that Defendant Rick Glein represented MQAC for settlement purposes while Defendant Debra Defreyn represented MQAC in all matters relating to the hearing. On June 15th, 2016, my attorney served the Answer to Corrected Statement of Charges and requested an adjudicative proceeding.

57. On June 24th, 2016, the Scheduling Order, Notice of Status Conference and Protective Order was served. This is when the adjudicative proceeding commences officially according to RCW 34.05.413(5). Then on July 11th, 2016, the Scheduling Order, Notice of Hearing was served to set the hearing date for January 30 – February 1, 2017.

58. It was not until October 6th, 2016 that MQAC granted me a settlement conference. In addition to the RCM, Defendant Brueggemann, attorneys Rick Glein and Debra Defreyn were also attending. These defendants interrogated me in person for the first time. I answered all of their questions and explained to them the reasons for my verbal refusal to

consult and accept these inappropriate transfer requests. During this conference, I insisted

that I was never found to have violated EMTALA by any *federal* administrative agency

with the competency and jurisdictional authority to adjudicate complaint of "a potential

EMTALA violation." I also have never been a party of any lawsuit, judgment, or

settlement involving medical negligence or malpractice to this day. My refusals were

purely my expression of a professional opinion to members of the public in the absence

of any patient-physician relationship and cannot be construed to be unprofessional

conduct prohibited by RCW 18.130.180. I strongly urged MQAC to drop these charges.

My professional opinion in the absence of a doctor-patient relationship was clearly

protected by the First Amendment to the US Constitution.

59.   After this settlement conference. MQAC proposed its Stipulated Findings of Fact,

Conclusions of Law, and Agreed Order. Its conclusions of law did not include violations

of RCW 18.130.180(7) and EMTALA 42 U.S.C. § 1395dd(d)(1)(B). By eliminating

these charges, these MQAC officials knew that they did not have EMTALA subject

matter jurisdiction to adjudicate a claim of "*potential* EMTALA violation" but went

ahead with their adjudicative proceeding with clear absence of EMTALA subject matter

jurisdiction. Without a formal adjudication of this "potential EMTALA violation" by the

US Department of Health and Human Services as prescribed by 42 U.S.C. § 1320a–7a,

MQAC did not have "the clear and convincing evidence" of an EMTALA violation.

MQAC does not have the statutory authority to manufacture an EMTALA violation after

CMS had declined to pursue an administrative action against me. By proceeding to

adjudicate this "*potential* EMTALA violation" claim, these state officials acting under

the color of state law and without EMTALA subject matter jurisdiction violated my

constitutional right to due process and equal protection under the law. Incidentally, CMS

of the US DHHS also has the field dominance and preemption over EMTALA matters

and claims.

60.    Furthermore, when MQAC reported its administrative proceeding and disciplinary action

against me to the National Practitioner Data Bank in October 2nd, 2017, it did not report

that I violated EMTALA because MQAC knew that EMTALA subject matter jurisdiction

is exclusively delegated to the US Department of Health and Human Services – the

Center for Medicare Services (CMS). Yet, in the "Clerk's Summary" of the Final Order,

MQAC stated that I violated EMTALA 42 U.S.C. § 1395dd(d)(1)(B) and not 42 U.S.C. §

1395dd(g).

61.    By the time of the settlement conference, MQAC knew or should have already known

that in July 2014 CMS did investigate this claim of "a potential EMTALA violation" by

the FHS defendants but chose not to pursue any charges or conduct an administrative

adjudication against me for this incident. As such, it was clearly understandable that

MQAC decided to drop the violations of RCW 18.130.180(7) and EMTALA 42 U.S.C. §

1395dd(d)(1)(B) from its proposed Agreed Order. However, MQAC defendants

continued to insist on charging me and proceeding with their administrative hearing

without reasonable cause. This is a clear violation of the Fourth Amendment which

protects individual privacy interests against unwarranted intrusions by government

officials even in administrative law. The basic purpose of the Fourth Amendment, which

is enforceable against the States through the Fourteenth Amendment, through its

prohibition of "unreasonable" searches and seizures is to safeguard the privacy and

security of individuals against arbitrary invasions by governmental officials. *Camara v.*

*Municipal Court*, 387 U.S. 523, 528 (1967). Additionally, my constitutional right to due

process and equal protection under the law dictates that a claim of "a potential EMTALA

violation" be investigated and adjudicated by either CMS or the Office of the Inspector
General (OIG) of the US DHHS, the only two administrative agencies with the EMTALA
subject matter jurisdiction to conduct an adjudicative proceeding against EMTALA
violation to enforce it. 42 U.S.C. § 1320a–7a. MQAC violated my Fourth, Fifth and
Fourteenth Amendment right by adjudicating this complaint of "a potential EMTALA
violation" without clear EMTALA subject matter jurisdiction.

62.   In Washington state, medical disciplinary proceeding is classified as quasi-criminal. The
      Washington Supreme Court imposed on MQAC the burden of clear and convincing
      standard of proof. *Nguyen v. State*, *Dep't of Health Med. Quality Assurance Comm'n*, 144
      Wn.2d 516, 29 P.3d 689 (Wash. 2001). "It is not strictly adversary in nature." *Id* at 528.
      A "potential EMTALA violation" that has never been adjudicated by the federal agencies
      with EMTALA subject matter jurisdiction (CMS and the OIG of the US Department of
      Health and Human Services) per 42 U.S.C. § 1320a–7a hardly satisfied such clear and
      convincing burden of proof. Only an *actual* judgment from CMS or the OIG of the US
      DHHS can.

63.   While it was legally sound that MQAC dropped the violations of RCW 18.130.180(7)
      and EMTALA 42 U.S.C. § 1395dd(d)(1)(B) from its proposed Agreed Order, I refused to
      accept this Agreed Order because I should not be punished and censored for what I said
      to the emergency room providers in the absence of an implicit or explicit doctor-
      physician relationship and a duty of care. I did not agree to take emergency calls for the
      ED's of any hospital in the FHS other than SJMC. My statement that I was not on call at
      St Clare Hospital was not only factual but also protected by the First Amendment of the
      Constitution. My "refusal" to accept these transfers from outlying hospitals based on my

professional opinion that they were not appropriate was purely my exercise of my freedom of expression protected by the First Amendment.

64. Throughout the entire process, MQAC never notified me of the applicable time periods per WAC 246-14-120, which is also violation of my constitutional rights to due process and equal protection of the laws guaranteed by the Fifth and Fourteenth Amendments. This lack of notification also violated RCW 34.05.080(7).

65. The administrative hearing lasted from January 30th, 2017 through February 1st, 2017. MQAC Panel included Defendants Johnson, Howe, and Yu. The presiding officer was Defendant Dixon. Defendant Defreyn represented MQAC's case.

66. Defendant Moore, who was the complainant and my accuser of a "potential EMTALA violation", testified falsely under oath that she was not aware of an "ongoing discussion between the ENT specialists and the Franciscans about the issue of community call" before her phone call with me regarding "Patient C" on June 8th, 2017.

67. On the third day of the hearing, Defendant Dixon was asked to admit new evidence in the form of four (4) strings of emails to challenge Defendant Moore's false testimony and credibility as a witness. He ruled to exclude the new evidence, violating my due process right to presenting evidence and having an unbiased tribunal.

68. To conclude the proceeding on February 1st, 2017, Defendant Dixon announced that "we try to get an order out within 45 to 90 days."

69. On May 3rd, 2017 Defendant Dixon *untimely* issued and served a post-hearing order extending time to issue the final order to May 26th, 2017. This date of May 3rd, 2017 was itself more than 90 days from February 1st, 2017 and thus violative of RCW 34.05.461(8)(a) and my constitutional due process right. After this new deadline, MQAC remained silent and did not notify me of the reason for missing this new deadline. This is

a gross violation well-established law, RCW 34.05.461(8)(a), RCW 34.05.080(7), and

WAC 246-14-120 enacted to ensure my constitutional due process and equal protection

under the law.

70. It was not until October 2nd, 2017 that I was served with the Findings of Fact,

Conclusions of Law, and Final Order (Final Order) signed on September 29th, 2017.

MQAC never informed me of the reasons for this delay, violating RCW 34.05.080(7).

This service of the final order was obviously much later than May 26, 2017 and thus was

again violative of RCW 34.05.461(8)(a) and my constitutional due process right.

71. In the Final Order dated September 29th, 2017, MQAC found the following:

    a. I was "employed by SJMC at all times relevant to this matter."
    b. I did not violate the standard of care or EMTALA with regard to Patient A.
    c. I did not violate EMTALA with regard to Patient B. However, my "refusal to consult with the emergency room doctor concerning the care of Patient B lowered the standard of the profession in the eyes of the public." My "refusal" created an unreasonable risk of harm to Patient B.
    d. The Commission reached the legal conclusion with clear and convincing evidence that I violated RCW 18.130.180 (1), (4), and (7).
    e. MQAC also concluded that I violated EMTALA with regard to Patient C even though it has no interpretative competency or subject matter jurisdiction on 42 U.S.C. § 1395dd(d)(1)(B). MQAC offered no evidence that either CMS or the OIG of the US DHHS had adjudicated this claim of "potential EMTALA violation" and then concluded that I violated EMTALA in accordance with 42 U.S.C. § 1320a–7a.
    f. MQAC also offered no evidence that these persons "A", "B", and "C" received "health care from" me to meet the definition of "Patients" according to WAC 246-16-020(5). Neither did MQAC provide any evidence that I directly communicated and formed a doctor-patient relationship with these persons "A", "B", and "C" either explicitly or implicitly to create my duty of care to them. Yet, MQAC legally concluded that I practiced below the standard of care and committed "incompetence, negligence, or malpractice" because of my verbal "refusal to consult with fellow physicians and treat patients." COL 2.6 and 2.12. MQAC offered no legal authority supporting its position that my verbal "refusal" is unprotected speech and removed from the First Amendment's ambit.
    g. MQAC also concluded, "the Respondent's refusal to aid and consult with fellow physicians, while acting as an on-call specialist, constitute [sic] acts of moral turpitude." COL 2.4. MQAC again offered no legal authority supporting its position that my verbal "refusal" is speech unprotected by the First Amendment.
    h. The Commission ordered that my medical license be subject to 2 years of oversight. I also was ordered to be monitored for good behavior, pay a $5,000 fine, appear before

the Commission, take an ethics course, write a research paper, and satisfy other conditions.

72. MQAC violated clearly established law protecting my freedom of speech and expression because the First Amendment means that MQAC has no power to restrict and punish my expression "because of its messages, its ideas, its subject matter or its content." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002).

73. Footnote 23 of MQAC final order states, "At hearing, the Respondent testified that he did not refuse to consult or treat Patient B. Rather, he told the doctor calling on behalf of St. Francis to 'let me call you back when I get home, so I can look at information to see if this is an appropriate transfer.' The Panel was not persuaded by Respondent's testimony and deemed this act a refusal to consult." This is clearly a content-based regulation of speech prohibited by the First Amendment.

74. Footnote 28 of MQAC final order states, "At hearing, the Respondent testified that an injury suffered prior to being contacted about Patient C rendered him unavailable to treat Patient C, due to pain and having taken narcotic pain medication. The Panel was not persuaded by Respondent's after-the-fact justification." This is another textbook content-based restriction on speech because MQAC is regulating my speech based on its communicative content and my viewpoint.

75. Because MQAC restricted what I can and cannot say as a licensed physician, it violated clearly established First Amendment right and created a "collision between the power of government to license and regulate those who would pursue a profession or vocation and the rights of freedom of speech and of the press guaranteed by the First Amendment." *Lowe v. S.E.C.,* 472 U.S. 181, 228, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) (White, J., concurring in the result).

76. Conclusion of Law (COL) 2.8 in the Final Order stating, "[t]he Department proved by clear and convincing evidence that the Respondent committed unprofessional conduct as defined in EMTALA, 42 USC Sec. 1395dd(d)(1)(B)" is false and baseless because EMTALA has absolutely *no* definition of an "unprofessional conduct" in its plain text.

77. In the absence of any lawful adjudication and then judgment by CMS or the OIG from the US DHHS that I violated EMTALA pursuant to 42 U.S.C. § 1320a–7a, COL 2.8 stating that "the Respondent violated EMTALA" was untruthful and conclusory. MQAC thus violated my constitutional rights to due process and equal protection under the law guaranteed by the US Constitution.

78. On October 11th, 2017, Defendant Defreyn timely filed a petition for reconsideration to correct two errors of facts in the Final Order. This petition must be disposed of "within twenty days from the date the petition is filed" or is deemed "denied" thereafter according to RCW 34.05.470(3).

79. On October 30th, 2017, I timely filed my petition for judicial review of the Commission's Final Order with the King County Superior Court case no. 17-2-28129-8 KNT, invoking its appellate jurisdiction on this matter. This action also terminated and finalized the administrative proceeding before MQAC. The Final Order became the final judgment by MQAC. *Res judicata* attached to the Final Order.

80. On November 2nd, 2017, defendant Dixon *untimely* issued and served another post-hearing order setting a briefing schedule without granting or denying the Commission's petition for reconsideration. This *untimely* action violated my constitutional due process right. The petition for reconsideration was deemed denied because defendant Dixon did not follow procedural due process mandated by RCW 34.05.470(3). Defendants Dixon, Howe, Johnson, and Yu acted without subject matter jurisdiction because the King

County Superior's appellate jurisdiction was invoked by my petition for review on

October 30th, 2017.

81. Footnote number 2 of the Amended Final Order reads, "On November 1st, 2017, the

Respondent filed his Petition for Judicial Review in King County Superior Court." This

statement is grossly untruthful because my petition for judicial review was in fact filed on

October 30th, 2017. Yet, defendant Dixon and MQAC's panel members willfully went on

to amend its *Final* Order, violating not only RCW 34.05.470(3) but also *res judicata*

doctrine, Superior Court Civil Rule (CR) 60(a)[2] and Rules of Appellate Procedure (RAP)

7.2(e)[3]. These defendants knowingly and maliciously violated my procedural due process

as well as my right to equal protection under the law guaranteed by the US Constitution.

82. Suddenly on December 26, 2017, I received a new *amended* Final Order dated December

20th, 2017 and served on December 22, 2017. Through no fault of my own, my

"sentence" had been extended from September 29th, 2017 to December 20th, 2017

---

[2] CR 60

(a)  Clerical Mistakes. Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. Such mistakes may be so corrected before review is accepted by an appellate court, and thereafter may be corrected pursuant to RAP 7.2(e).

[3] RAP 7.2

Postjudgment Motions and Actions To Modify Decision. The trial court has authority to hear and determine (1) postjudgment motions authorized by the civil rules, the criminal rules, or statutes, and (2) actions to change or modify a decision that is subject to modification by the court that initially made the decision. The postjudgment motion or action shall first be heard by the trial court, which shall decide the matter. If the trial court determination will change a decision then being reviewed by the appellate court, the permission of the appellate court must be obtained prior to the formal entry of the trial court decision. A party should seek the required permission by motion. The decision granting or denying a postjudgment motion may be subject to review. Except as provided in rule 2.4, a party may only obtain review of the decision on the postjudgment motion by initiating a separate review in the manner and within the time provided by these rules. If review of a postjudgment motion is accepted while the appellate court is reviewing another decision in the same case, the appellate court may on its own initiative or on motion of a party consolidate the separate reviews as provided in rule 3.3(b).

because RCW 34.05.473(1) states, "Unless a later date is stated in an order or a stay is granted, an order is effective when entered." This action is a gross violation of my Fifth and Fourteenth Amendment right to due process and equal protection under the law. Defendants Dixon, Howe, Johnson, and Yu again acted outside of their jurisdictional authority and violated *res judicata* because this matter had been before the King County Superior Court since October 30th, 2017.

83.   On December 26th, 2017, the Washington Health Care Authority terminated my Washington State Medicaid Contract pursuant to WAC 182-502-0030 because of MQAC's action on my medical license. This serves no public interest because the Washington State Medicaid population no longer has me as a competent and skilled surgeon to provide them with Ear, Nose, and Throat specialty services. MQAC Defendants' action on account of racial animus and discrimination damaged my Medicaid contract and is a violation of my right to make and enforce contract secured by 42 U.S. Code § 1981.

84.   On June 1st, 2018, the Oklahoma State Board of Medical Licensure and Supervision (the Board) served me with the Verified Complaint because of the disciplinary action taken by MQAC. Subsequently, the Board issued its Citation charging me with violation of Okla. Admin. Code§ 435:10-7-4(31). On September 27th, 2018, the Board amended its Verified Complaint and Citation charging me with "violations of the Medical Practice Act at 59 O.S. § 509(9), (13); and Okla. Admin. Code§ 435:10-7-4, (31), (39)". A hearing was scheduled for May 9th, 2019. The Board then issued its Order for a Continuance and rescheduled my hearing for November 7th, 2019. I submitted my prehearing memorandum and raised issues of EMTALA subject matter jurisdiction and unsupported legal conclusions by MQAC for lack of a doctor-patient relationship and duty of care.

The unbiased Board promptly dismissed the Complaint and Citation simply based on my prehearing pleading and legal memorandum and subsequently canceled the administrative hearing.

85.    My Petition for Judicial Review came before the King County Superior Court on June 29, 2018. The judge issued her ruling and order on August 9th, 2018. While recognizing multiple violations of the Washington Administrative Procedure Act enacted to ensure due process, the judge considered these violations as "procedural irregularities", which "did not undermine the fundamental fairness of the proceedings and did not violate the Petitioner's Due Process Rights." However, the superior court concluded that "Petitioner has been prejudiced by the failure to comply with deadlines for issuing the decision." The judge opined, "However, the delay in the order has prejudiced the Petitioner by extending the period of time period he has been subject to sanctions or the possible imposition of sanctions. Although the Petitioner's license was not restricted during the pendency of the proceeding or order, a two-year period of monitoring that should have been completed as of May 26, 2019 had the order been timely issued, has been extended to September 29, 2019." As a result, she ordered, "The effective date of the Final Order shall be deemed to be May 26, 2017 and not September 29, 2017. Accordingly, Dr. Dang may petition the Commission in writing to terminate the Final Order on or after May 26, 2019 if he has fully complied with all requirements of the Final Order." She did not rule on the legality of the *Amended* Findings of Fact, Conclusions of Law, and Final Order dated on December 20th, 2017 even though she recognized "The Presiding Officer's Post-Hearing Order No. 2: Order Setting Briefing Schedule on the Department's timely Petition for Reconsideration was signed one (1) day and served two (2) days beyond the required

twenty (20) days required by WAC 246-11-580." She did not affirm the *Amended* Final Order.

86. I timely filed my Notice of Appeal of the Superior Court's order to the Washington Court of Appeals Division I case no. 78910-4-I on September 5th, 2018.

87. Defendants Debra Defreyn and Christina Pfluger, acting as defense attorneys and not prosecutors, represented MQAC in the judicial review in the King County Superior Court and subsequently the Washington Court of Appeals Division I. In their private capacity, they conspired with MQAC and FHS defendants in furtherance of MQAC's violation of my rights guaranteed by the First, Fifth, Fourteenth Amendments, and 42 U.S. Code § 1981 and FHS Defendants' violation of my right to make and enforce contract secured by 42 U.S. Code § 1981. In their official capacity as Washington state employees under the color of state law, they defended MQAC defendants' violations of clearly established laws protecting my rights to free speech, due process, equal protection under the law, and to "make and enforce" my employment contract. Through extensive briefings and review of the administrative records, they knew of the facts of the case and the violations of clearly established law including RCW 34.05 protecting my constitutional rights to fundamental fairness, due process, equal protection under the law, and free speech. Yet, they still defended and supported such clear violations of my civil rights on account of race. They also knew that MQAC is not a court of general jurisdiction and does not have the subject matter jurisdiction to adjudicate a "potential EMTALA claim" according to the plain language of 42 U.S.C. § 1320a–7a but still defended MQAC in furtherance of the common goal of violating my civil rights.

88. On August 19th, 2019, defendant judges Schindler, Appelwick, and Leach of the Washington Court of Appeals Division I (COA) filed their opinion, which affirmed "the

1   *amended* MQAC decision and final order." The *Amended* Findings of Fact, Conclusions

2   of Law, and Final Order was affirmed even though it was issued in violation of my

3   constitutional rights to free speech, due process, and equal protection as described in ¶¶

4   46, 47, 55, 64, 67, 69, 70, 72 – 77, and 79 – 82. The defendant judges ignored and

5   justified for all MQAC's violations of statutory procedural rules and time limits

6   mandated by the Washington Administrative Procedure Act and Uniform Disciplinary

7   Act. This COA review and opinion were unconstitutional and fundamentally unfair.

8   89.   Most notably, the COA defendant judges concluded, "[t]he plain language of RCW

9   18.130.180(1) and (4) does not require MQAC to find a duty of care." As applied and

10   construed in this case by Defendants Schindler, Appelwick, and Leach, RCW

11   18.130.180(1) and (4) violated my First Amendment right to freely communicate and

12   express my professional opinion to other healthcare providers regarding the

13   appropriateness of certain requests for transfers. Verbal or written communications, even

14   those that function as vehicles for delivering professional services, are "speech" for

15   purposes of the First Amendment. *Holder v. Humanitarian Law Project,* 561 U.S. 1 at

16   27–28, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010). By affirming the *Amended* Final Order,

17   the defendant judges engaged in content-based and viewpoint discrimination of my

18   speech and expression of opinion because "outside the doctor-patient relationship,

19   doctors are constitutionally equivalent to soapbox orators and pamphleteers, and their

20   speech receives robust protection under the First Amendment." *Pickup v. Brown*, 740

21   F.3d 1208, 1227-8 (9th Cir. 2014).

22   90.   Defendants Schindler, Appelwick, and Leach ignored binding precedents on statutory

23   time limits, rules of statutory construction, Civil Rule and Rules of Appellate Procedure,

24   *res judicata*, and ultimately the US Constitution to affirm the unlawful *Amended* Final

Order. As such, they violated my constitutional rights to due process, equal protection under the law, and free speech.

91. On October 30th, 2017, I petitioned the King County Superior Court for judicial review of the Findings of Fact, Conclusions of Law, and Final Order dated September 29th, 2017. In fact, I never filed a petition for judicial review of the *Amended* Findings of Fact, Conclusions of Law, and Final Order dated December 20th, 2020. As such, Defendants Schindler, Appelwick, and Leach did not have appellate jurisdiction for judicial review of the *Amended* Findings of Fact, Conclusions of Law, and Final Order to affirm it. Yet, they still affirmed it in furtherance of this concerted effort to violate my clearly established constitutional rights because of racial animus and discrimination. I may be an immigrant Asian American with a Vietnamese accent and little experience in oral argument in front of the COA judges. Nevertheless, I am entitled to the same civil rights to due process, equal protection under the law, and free speech and the right to make and enforce contract guaranteed by the US Constitution and 42 U.S. Code § 1981.

92. Furthermore, the COA judges opined, "we note that under the plain and unambiguous language of RCW 18.130.180(7), MQAC has the authority to determine whether "**[v]iolation** of any state or <u>federal statue</u> [sic] or administrative rule regulating the profession in question, including any statute or rule defining or establishing standards of patient care or professional conduct or practice," constitutes unprofessional conduct." (Emphasis added). However, MQAC offered no record of an adjudicative proceeding in compliance with 42 U.S.C. § 1320a–7a(c) and final judgment by CMS or the OIG of the US DHHS stating that I actually violated EMTALA 42 U.S.C. § 1395dd(d)(1)(B). A letter self-reporting a "*potential* EMTALA violation" by FHS for an illegitimate purpose of retaliation and racial animus and discrimination was *not* an actual "violation." The

COA judges violated my constitutional right to due process and equal protection under the law. The COA judges perpetuated racism in furtherance of a conspiracy by FHS and MQAC to violate my civil rights and right to make and enforce contracts on account of my race.

93. I timely filed a Motion for Reconsideration to the COA arguing that RCW 18.130.180(1) and (4) as construed and applied by the COA would mean prohibiting my professional speech and medical judgment. Such construction is not constitutionally narrow enough to avoid conflict with the First Amendment in this case. The COA denied my motion for reconsideration on October 23rd, 2019 without passing on this federal constitutional question. The COA defendant judges ignored their duty to uphold the rules of law and the US Constitution.

94. I timely filed my petition for review of the COA's judgment with the Washington Supreme Court on November 21st, 2019 and raised the issue of "whether RCW 18.130.180(1) and (4) prohibit a physician from exercising his or her speech and independent medical opinion." The Washington Supreme Court denied my petition for review on March 4, 2020 without passing on this federal constitutional question.

95. My timely Petition for a Writ of Certiorari for judicial review to the US Supreme Court was denied on October 5th, 2020.

## V.    INJURIES

96. As a direct or proximate result of the racial animus, discrimination, and harassment by FHS and its employees and officers, my employment contract with GHP had to be terminated due to increasingly hostile work environment.

97. As a direct or proximate result of the unlawful disciplinary action by MQAC in violation of my constitutional rights to free speech, privacy, due process, and equal protection

under the law, I had to resign from my staff otolaryngologist position with GHP and have

not been able to obtain meaningful employment in my specialty.

98.   Although the Oklahoma Board of Medical Licensure and Supervision dismissed its

Verified Complaint and Citation without prejudice, my medical license in Oklahoma

State and professional standing are forever blemished and tarnished because of MQAC

Defendants' conduct.

99.   MQAC reported its disciplinary action against me and its "limitation or restriction" on

my Washington state medical license to the National Practitioner Data Bank (NPDB) for

an "indefinite" length of action. Exhibit 4. This report has constrained and will hinder my

ability to seek employment as a board-certified otolaryngologist.

100.  The Washington Health Care Authority (Washington State Medicaid) terminated my

contract and participation in Medicaid program on December 26th, 2017 for an "indefinite

length of action" because of MQAC's action on my medical license. Exhibit 4.

101.  I sustained severe emotional distress as a direct and proximate result of the Defendants'

conduct and the subsequent injuries described in the previous paragraphs. Additionally, I

faced humiliation, shame, and inconvenience when addressing inquiries of MQAC

disciplinary action by the American Board of Otolaryngology.

## VI.   CAUSE OF ACTION

102.  For each of the following causes of action, Plaintiff repeats and re-incorporates the facts

and allegations set forth in ¶¶ 1 through 101, inclusive, as though fully set forth herein.

### FIRST CAUSE OF ACTION -- VIOLATION OF 42 U.S.C. §1983

103.  Defendants Johnson, Howe, Yu, Brueggemann, Glein, Dixon, Defreyn, Pfluger, and

Slavin, acting under color of state law, the Uniform Disciplinary Act RCW 18.130,

deprived Plaintiff of rights secured by the Constitutional First, Fourth, Fifth, and

Fourteenth Amendments and federal statute 42 U.S.C. §1981 as well as Washington

Administrative Procedure Act RCW 34.05. The Defendants adjudicated a claim of "a

potential EMTALA violation" without clear subject matter jurisdiction pursuant to 42

U.S.C. § 1320a-7a, violating my clearly established rights to due process, equal

protection under the law, and privacy against intrusions by MQAC officials. The

Defendants also censored my speech and expression of my opinion in the absence of a

professional relationship with persons "A", "B", and "C", violating clearly established

right to free speech and expression. Throughout the administrative proceeding, the

Defendants violated multiple procedures and statutory time limits set forth in the

Washington Administrative Procedure Act RCW 34.05 and Uniform Disciplinary Act

RCW 18.130, depriving me of my constitutional rights to due process and equal

protection under the law.

104.   Defendants Moore, Adams, Clark, Bersante, Patel, and Franciscan Health System

(respondeat superior) conspired with Defendants named in ¶ 103 and thus acted under

color of state law and in concert with state officials with the common objective of

depriving Plaintiff of clearly established rights as described in ¶ 103.

105.   Defendants judges Schindler, Leach, and Appelwick affirmed the *Amended* Final Order

by ignoring the US Constitution, well-established legal precedents, statutory construction

principles, *res judicata* doctrine, and MQAC's clear violations of statutory time limits

and procedures, violating my rights due process and equal protection under law. Their

construction and application of RCW 18.130.180(1) and (4) in this case was

unconstitutional, violating the First Amendment and its well-established jurisprudence.

Their conduct perpetuated racial animus and discrimination by defendants named in ¶¶

103 and 104 and their violations of my clearly established rights as described in ¶ 103.

106.   As a result of Defendants' violation of the First, Fourth, Fifth, and Fourteenth
Amendments to the US Constitution as described in ¶ 103 - 105, Plaintiff suffered from
grave injuries in his property, contract, and professional standings as described in ¶¶ 96 –
101 of this complaint. Plaintiff, a board-certified otolaryngologist head and neck surgeon,
has been denied employment opportunities providing substantial compensation and
benefits, thereby entitling Plaintiff to injunctive and equitable monetary relief. Plaintiff
has also suffered anguish, grief, humiliation, distress, inconvenience, and loss of
enjoyment of life because of Defendants' actions, thereby entitling them to compensatory
damages. Most importantly, Plaintiff suffered from loss of liberty from the civil rights
violation by these Defendants.

107.   In their discriminatory conduct and actions as alleged above, Defendants named in ¶¶ 103
and 104 have acted with malice and reckless indifference to the rights of Plaintiff,
thereby entitling Plaintiff to an award of punitive damages.

108.   To remedy the violations of the rights of Plaintiff secured by the First, Fourth, Fifth, and
Fourteenth Amendments of the US Constitution and Section 1981 of 42 U.S. Code,
Plaintiff requests that the Court award me the relief prayed for below.

109.   Present and actual justiciable controversies exist between Plaintiff and Defendants
concerning their rights and respective duties. Plaintiff contends that (1) MQAC lacks
EMTALA subject matter jurisdiction to independently adjudicate the underlying claim of
a "potential EMTALA violation" (Exhibit 1) for negligently violating 42 U.S.C. §
1395dd(d)(1)(B) pursuant to 42 U.S.C. § 1320a–7a; (2) Defendants violated Plaintiff's
Fourth Amendment right to privacy against intrusions by MQAC officials because they
acted without probable cause or evidence that I was found guilty of an EMTALA
violation by a competent federal administrative agency with EMTALA subject matter

jurisdiction after its lawful adjudication of this claim of "potential EMTALA violation" by FHS; (3) Defendants violated my Fifth and Fourteenth Amendment rights to due process and equal protection under the law as alleged in ¶¶ 47, 55, 64, 67, 69, 70, , and 79 – 82; (4) Defendants violated my First Amendment right as alleged in ¶¶ 72 – 75. Plaintiff is informed and believes and thereon alleges that the Defendants deny these allegations. Declaratory relief is therefore necessary and appropriate.

110.   No plain, adequate, or complete remedy at law is available to Plaintiff to redress the wrongs addressed herein.

111.   If this Court does not grant the declaratory and injunctive relief sought herein, Plaintiff will be irreparably harmed.

## SECOND CAUSE OF ACTION -- VIOLATION OF 42 U.S.C. §1981

112.   The racial animus, discrimination, and harassment by Defendants Moore, Adams, Clark, Bersante, Patel, and Franciscan Health System (respondeat superior) impaired the Plaintiff's right to "make and enforce" my employment contract with GHP violating the Civil Rights Act 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

113.   By their conduct described above, Defendants named in ¶ 112 racially discriminated and harassed Plaintiff to create a hostile work environment leading to Plaintiff's constructive discharge. As such, Defendants intentionally deprived Plaintiff of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of Plaintiff's contractual employment relationship with GHP in violation of 42 U.S.C. §1981.

114.   On account of race, Defendants Johnson, Howe, Yu, Brueggemann, Glein, Dixon, Defreyn, Pfluger, and Slavin engaged in unlawful and discriminatory conduct to damage Plaintiff's medical license and professional standing and thus impair Plaintiff's right to

make and enforce employment contract pursuant to 42 U.S.C. §1981. Their previously described conduct caused (1) constructive termination of Plaintiff's employment contract due to increasingly hostile work environment and (2) the termination of Plaintiff's contract with the WA Healthcare Authority (WA Medicaid program). As such, these Defendants intentionally deprived Plaintiff of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of Plaintiff's existing contractual employment relationship with GHP, in violation of 42 U.S.C. §1981.

115.   As a result of Defendants' violation of 42 U.S.C. §1981 as described in ¶ 112 – 114, Plaintiff suffered from grave injury to his medical license, professional standing and reputation, and professional livelihood as described in ¶¶ 96 – 101 of this complaint. Plaintiff also has been denied employment opportunities with substantial compensation and benefits as a board-certified otolaryngologist head and neck surgeon, thereby entitling Plaintiff to injunctive and equitable monetary relief. Plaintiff has also suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitling them to compensatory damages.

116.   In their discriminatory conduct and actions as alleged above, Defendants named in ¶ 112 and 114 have acted with malice and reckless indifference to the rights of Plaintiffs, thereby entitling Plaintiff to an award of punitive damages.

117.   To remedy the violations of the rights of Plaintiff secured by 42 U.S.C. § 1981 to make and enforce employment contract, Plaintiff requests that the Court award me the relief prayed for below.

<u>THIRD CAUSE OF ACTION -- VIOLATION OF 42 U.S.C. §1985(3)</u>

118.   In their private capacity and on account of race, Defendants named in ¶ 112 conspired with Defendants named in ¶ 114 using the MQAC disciplinary process to advance a series of actions against Plaintiff designed to improperly stifle my speech and deprive Plaintiff of due process, equal protection under the law, and privacy against intrusions by MQAC officials guaranteed by the US Constitution as well as the right to make and enforce contracts according to 42 U.S.C. § 1981.

119.   Because of Defendants' conduct described above, Plaintiff suffered from grave injuries in his property contracts, and professional standings as described in ¶¶ 96 – 101 of this complaint. Plaintiff also has been denied employment opportunities with substantial compensation and benefits as a board-certified otolaryngologist head and neck surgeon, thereby entitling Plaintiff to injunctive and equitable monetary relief. Plaintiff has also suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitling them to compensatory damages.

120.   In their discriminatory conduct and actions as alleged above, Defendants named in ¶ 112 and 114 have acted with malice and reckless indifference to the rights of Plaintiffs, thereby entitling Plaintiff to an award of punitive damages.

121.   To remedy the violations of the rights of Plaintiff secured by 42 U.S.C. § 1981 to make and enforce employment contract, Plaintiff requests that the Court award me the relief prayed for below.

FOURTH CAUSE OF ACTION -- VIOLATION OF WASHINGTON STATE CONSTITUTION, CIVIL RIGHTS ACT RCW 49.60.030, ADMINISTRATIVE PROCEDURE ACT RCW 34.05, AND CONSUMER PROTECTION ACT RCW 19.86

122.   On account of race, Defendants named in ¶ 112 acted in concert with Defendants named in ¶ 114 to improperly (1) stifle Plaintiff's speech and expression in violation of the Washington State Constitution Article I Section 5, (2) deprive Plaintiff of due process

1   and civil rights in violation of the Washington State Constitution Article I Section 3,

2   Washington Administrative Procedure Act RCW34.05, and Uniform Disciplinary Act

3   RCW 18.130, and (3) to make and enforce contracts in violation of Washington State

4   Civil Rights Act RCW 49.60.030.

5   123.   By Defendants' conduct described above, Plaintiff suffered from grave injuries in his

6   property, contracts, and professional standings as described in ¶¶ 96 – 101 of this

7   complaint. Plaintiff also has been denied employment opportunities with substantial

8   compensation and benefits as a board-certified otolaryngologist head and neck surgeon,

9   thereby entitling Plaintiff to injunctive and equitable monetary relief. Plaintiff has also

10   suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life

11   because of Defendants' actions, thereby entitling them to compensatory damages.

12   124.   To remedy the violations of the rights of Plaintiff secured by the Washington State

13   Constitution and laws as described in ¶ 122, Plaintiff requests that the Court award

14   Plaintiff the relief prayed for below.

15   **VII.   PRAYER FOR RELIEF**

16   WHEREFORE, Plaintiff prays that the Court grant relief on the First, Second, Third and

17   Fourth Causes of Action as specified below.

18   1.   Plaintiff prays that the Court assign the case for hearing(s) at the earliest practicable

19   date(s) and cause the case to be in every way expedited.

20   2.   Plaintiff seeks a judicial declaration of the rights and duties of the respective parties.

21   3.   Plaintiff prays that the Court issue a declaratory judgment against Defendants named in

22   ¶¶ 103 and 105 above, finding that the Defendants have violated the rights of Plaintiff

23   secured by the First, Fourth, Fifth, and Fourteenth Amendments to the US Constitution.

24

4.   Plaintiff also prays that the Court issue a declaratory judgment against Defendants named in ¶¶ 112 and 114 above, finding that the Defendants have violated the right of Plaintiff to make and enforce contracts secured by 42 U.S.C. §1981.

5.   Plaintiff prays that the Court issue a preliminary and permanent injunction pursuant to 42 U.S.C. § 1983, §1981, and §1985(3), enjoining Defendants, members of MQAC and the Washington State Court of Appeals, from enforcing their respective orders because these are unconstitutional for violating the First, Fourth, Fifth, and Fourteenth Amendments of the US Constitution.

6.   Plaintiff prays that the Court enter a preliminary and permanent injunction ordering and requiring that Defendants FHS and MQAC members and staff formulate, institute, adopt and maintain policies and practices which will promote equal, fair, and nondiscriminatory treatment of Plaintiff and future Asian Americans, pro se appellants, and minority groups, and which will to the extent practicable remedy the continuing effects of past discrimination against Plaintiff and other racial minority groups.

7.   Plaintiffs pray that the Court award monetary relief as follows:

   a.   Equitable monetary relief, compensatory and punitive damages to Plaintiff in an amount to be proved at trial;

   b.   Costs, expenses, and attorneys' fees incurred in bringing this action by determining Plaintiff the prevailing party;

   c.   Costs, expenses, and attorneys' fees incurred for the administrative proceeding before MQAC, all petitions for judicial review of MQAC Final Order, compliance of MQAC Final Order;

   d.   Lost wages, including lost fringe benefits, past, present and future;

   e.   Loss of professional reputation and prestige;

1      f.      Emotional distress damages;

2      g.      Loss of liberty from the civil rights violations;

3      h.      Such other and different damages as may be identified through discovery and/or

4      at trial;

5      i.      Pre- and post-judgment interest in all monetary amounts awarded in this action, as

6      provided by law.

7  8.    Plaintiffs pray that the Court retain jurisdiction of this case for a sufficient period of time

8      to assure that Defendants have fully complied with the preliminary and permanent

9      injunctions requested herein and has remedied to the greatest extent practicable the

10     discriminatory policies and practices complained of herein.

11  9.    Plaintiffs pray that the Court award such other and further relief as this Court deems

12     equitable and just.

13          **VIII.   CERTIFICATION AND CLOSING**

14       Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my

15  knowledge, information, and belief that this complaint: (1) is not being presented for an improper

16  purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

17  (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or

18  reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so

19  identified, will likely have evidentiary support after a reasonable opportunity for further

20  investigation or discovery; and (4) the complaint otherwise complies with the requirements of

21  Rule 11.

22       I agree to provide the Clerk's Office with any changes to my address where case-related

23  papers may be served. I understand that my failure to keep a current address on file with the

24  Clerk's Office may result in the dismissal of my case.

Date of signing:          November 30th, 2020


Signature of Plaintiff

Printed Name of Plaintiff      HUNG DANG, M.D.

CATHOLIC HEALTH
INITIATIVES®

# Franciscan Health System

ST. JOSEPH MEDICAL CENTER

June 16, 2014

Kate Mitchell, RN, MHA
CMS- Division of Survey and Certification
701 5th Ave Suite 1600
Seattle, WA 98104

| EXHIBIT NO: | D - 1 |
| Admitted: | ✓ |
| Not Admitted: | |
| Date: | 1/30/17 |
| Case: | M2014 - 1258 |

Dear Ms. Mitchell,

The purpose of this letter is to notify you of a potential EMTALA violation that occurred at St. Joseph Medical Center (SJMC) on June 8, 2014. This letter follows the phone report of an EMTALA violation that I shared with you on 6/12/2014.

Event Summary:

A 27yo male arrived at St. Clare Hospital with a sore throat and right-sided ear pain; he was diagnosed with a tonsillar abscess and a suspected retropharyngeal abscess. St. Clare Hospital did not have an ear nose and throat (ENT) physician on-call. The treating emergency department (ED) physician contacted an ENT physician who was on-call at our system's tertiary care center, SJMC. The ENT physician refused to consult on this patient. The ED physician next consulted with Harborview, who was unable to accept the patient. The ED physician ultimately spoke with one of the Franciscan Health System's associate chief medical officers (ACMO) who recommended transferring the patient to SJMC.

After transfer to SJMC, the ED physician contacted the on-call ENT physician who refused to see the patient, stating that he did not accept the transfer. The ED physician contacted the ACMO, who also spoke with the ENT physician, but the ENT physician continued to refuse to see the patient. The ED physician made attempts to contact another local ENT physician, without success, and the patient was eventually transferred to Madigan Army Medical Center.

*A mission to heal, a promise to care.*

1717 South J Street Tacoma, WA 98405
Phone: 253.426.4101 www.FHShealth.org

ST. JOSEPH MEDICAL CENTER  •  ST. CLARE HOSPITAL  •  ST. FRANCIS HOSPITAL  •  ST. ELIZABETH HOSPITAL
ST. ANTHONY HOSPITAL  •  FRANCISCAN MEDICAL GROUP  •  FRANCISCAN HOSPICE AND PALLIATIVE CARE
FRANCISCAN OCCUPATIONAL HEALTH  •  FRANCISCAN FOUNDATION

DANG, MD
MD 2014-5589 00010005

Action Step:

- SJMC medical leadership will review and supplement EMTALA education with SJMC providers

I will send a follow-up letter regarding the timeline for completion of this action item. Please contact me with any questions.

Regards,



Ann Clark RN, MN, CPHRM
Risk Manager
St. Joseph Medical Center

cc Dr Kim Moore, Vice President of Quality and Associate Chief Medical Officer, FHS
Syd Bersante, President, SJMC
Julie Burns, Director of Accreditation and the Chief Patient Safety Officer, FHS

RECEIVED
JUN 19 2014
DHHS/CMS/.
Region 10

DANG, MD

MD 2014-5590 005019996


**CHI Franciscan Health**

*Our best care. Your best health.™*

1717 South J Street
PO Box 2197
Tacoma, WA 98401-2197

P 253.426.4101
chifranciscan.org

## Call Coverage Attestation Agreement

This AGREEMENT is entered into on this __28th__ day of September, 2015, between CHI Franciscan Health and Hung Huy Dang, M.D. (hereinafter "Parties").

The Medical Executive Committee of CHI Franciscan Health hereby sets forth the following condition for Hung Huy Dang, MD, continued membership and clinical privileges at CHI Franciscan Health:

1. Dr. Dang acknowledges having received or had access to the Franciscan Health System Medical Staff Bylaws, Rules and Regulations (Bylaws) and agrees to abide by the Bylaws, including terms concerning call coverage.

2. Dr. Dang agrees that he will provide care for all patients who present to St. Joseph Medical Center requiring emergency ENT services when he is on call, regardless of the site of patient entry into CHI Franciscan Health and/or prior affiliation or treatment relationship.

3. Dr. Dang understands that his clinical privileges and medical staff membership may be restricted, suspended or revoked if he fails to abide by the Bylaws, including those terms governing his call responsibilities.


Mark C. Adams, M.D.
Chief Medical Officer
CHI Franciscan Health

Date: __09-30-2015__

Hung Huy Dang, M.D.

Date: __Sept 28, 2015__

Return by fax to 253-680-2179 or by email to kimnighswonger@chifranciscan.org

| | | | |
|---|---|---|---|
| St. Anthony Hospital – Gig Harbor | St. Joseph Medical Center – Tacoma | Harrison HealthPartners | Foundations: |
| St. Clare Hospital – Lakewood | Franciscan Medical Group | Highline Medical Center – Burien | Franciscan Foundation |
| St. Elizabeth Hospital – Enumclaw | Harrison Medical Center | Regional Hospital – Burien | Harrison Medical Center Foundation |
| St. Francis Hospital – Federal Way | Bremerton + Silverdale | | Highline Medical Center Foundation |

1

2

3

4          **STATE OF WASHINGTON**
           **DEPARTMENT OF HEALTH**
5      **MEDICAL QUALITY ASSURANCE COMMISSION**

6    In the matter of the
     Investigation of                    NO. M2014-1258
7

8    HUNG H. DANG, M.D.,
                                          DECLARATION OF ALEX MOREANO,
                                          M.D.
9            Respondent.

10   I , ALEX MOREANO, M.D., declare as follows:

11       1.    I am over the age of eighteen years, am competent to testify, and make this

12   declaration based on personal knowledge.

13       2.    I am an otolaryngologist employed by GroupHealth. I currently practice with

14   Hung Dang, M.D. Our practice is affiliated with St. Joseph Hospital in Tacoma, WA, which is

15   part of the Franciscan Health System ("FHS").

16       3.    Over the past several years, there has been some confusion and disagreement

17   about the requirements for community call of admitting providers at FHS hospitals. Although

18   my practice is only affiliated with St. Joseph Hospital, FHS requires us to take community call

19   for all FHS campuses. In practice, this means that a patient who presents to an outlying FHS

20   campus may be transferred to St. Joseph Hospital for me to consult.

21       4.    Over the past several years, there have been efforts to change the system such that

22   admitting providers will only be required to take community call for their specific campus.

23

24   DECLARATION OF ALEX MOREANO, M.D. -   FLOYD, PFLUEGER & RINGER P.S.
     1                                     200 WEST THOMAS STREET, SUITE 500
25                                         SEATTLE, WA  98119-4296
                                           TEL 206 441-4455
                                           FAX 206 441-8484

DANG, MD
Inv. 000340

1   These efforts to change the practice have been largely ineffective.

2       5.      I have, in the past, taken the position that I was not required to consult on patients

3   from outlying FHS campuses while on community call. In part because of FHS' treatment of Dr.

4   Dang in this matter, I no longer take that position and consult on all FHS patients during my

5   community call.

6       6.      FHS enforces its bylaws arbitrarily and selectively. While my partners and I are

7   required to each take four weeks of community call per year, some other practitioners affiliated

8   with FHS are not required to take any. I know of at least one part-time practitioner at St. Joseph

9   Hospital who is not required to take any community call, even though the FHS bylaws require

10  active staff to do so.

11      7.      I do more work in the four weeks of community call for FHS than I do for my 18

12  weeks of annual call at Group Health. When I take community call in the FHS system, I am not

13  compensated for my services by FHS.

14      8.      I declare under penalty of perjury under the laws of the State of Washington that

15  the foregoing is true and correct.

16      DATED this __23__ day of __June__, 2015 at __Tacoma__, WA.

17

18                              _Alex E. Moreano M.D._
                                Alex Moreano, M.D.

19

20

21

22

23

24  DECLARATION OF ALEX MOREANO, M.D. -   FLOYD, PFLUEGER & RINGER P.S.
    2                                     200 WEST THOMAS STREET, SUITE 500
                                          SEATTLE, WA. 98119-4296
25                                        TEL 206 441-4455
                                          FAX 206 441-8484

DANG, MD
Inv. 000341

1

2

3

4    STATE OF WASHINGTON
     DEPARTMENT OF HEALTH
5    MEDICAL QUALITY ASSURANCE COMMISSION

6    In the matter of the                    NO. M2014-1258
     Investigation of
7
     HUNG H. DANG, M.D.,                      DECLARATION OF KEN DEEM, M.D.
8
              Respondent.
9

10   I , KEN DEEM, M.D., declare as follows:

11        1.    I am over the age of eighteen years, am competent to testify, and make this

12   declaration based on personal knowledge.

13        2.    I am an otolaryngologist ("ENT") employed by GroupHealth. I currently practice

14   with Hung Dang, M.D. Our practice is affiliated with St. Joseph Hospital in Tacoma, WA,

15   which is part of the Franciscan Health System ("FHS").

16        3.    For the past several years, there has been disagreement regarding the scope of

17   community call for admitting providers at FHS hospitals. Under the FHS Medical Staff Bylaws

18   and Rules and Regulations, community call is specific to each campus rather than the entire FHS

19   network. Nonetheless, although my practice is only affiliated with St. Joseph Hospital, FHS

20   requires us to take community call for all FHS campuses. In practice, this means that a patient

21   who presents to an outlying FHS campus may be transferred to St. Joseph Hospital for me to

22   consult.

23

24   DECLARATION OF KEN DEEM, M.D. - 1        FLOYD, PFLUEGER & RINGER P.S.
                                              200 WEST THOMAS STREET, SUITE 500
25                                            SEATTLE, WA  98119-4296
                                              TEL 206 441-4455
                                              FAX 206 441-8484

1     4.     Up until a year ago, providers were also attempting to perform informal transfers

2 that did not go through the formal mechanism of the patient transfer service.  In the past year,

3 FHS seems to have improved this practice.  Currently, patient transfers generally go through the

4 formal mechanism of the patient transfer service.

5     · 5.     Despite the FHS Bylaws, FHS is inconsistently applying its call protocols.  There

6 are ENT physicians at other FHS campuses who do not take call.  As such, FHS seems to firmly

7 apply its call requirements to its flagship hospital campus while loosely applying it to ENT

8 groups at outlying campuses.

9     6.     About one year ago, some members from my practice expressed disagreement

10 with FHS's inconsistent application of call protocols.  Some physicians would not consult on

11 patients who transfer to St. Joseph Hospital for consultation without having first agreed to accept

12 the responsibility for consultation.  This position was consistent with the FHS Medical Staff

13 Bylaws and Rules and Regulations.

14     7.     I declare under penalty of perjury under the laws of the State of Washington that

15 the foregoing is true and correct.

16     DATED this _22_ day of _June_, 2015 at _Tacoma_, WA.

18

                  Ken Deem, M.D.

19

20

21

22

23

24   DECLARATION OF KEN DEEM, M.D. - 2     FLOYD, PFLUEGER & RINGER P.S.

                                200 WEST THOMAS STREET, SUITE 500

25                               SEATTLE, WA  98119-4296

                                TEL 206 441-4455

                                FAX 206 441-8484

DANG, MD
Inv. 000338



NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

5500000157074854
Process Date: 02/19/2020
Page: 1    of    1

**To:**   DANG, HUNG HUY

27222 10TH AVE S

DES MOINES, WA 98198-9314

**From:**   National Practitioner Data Bank
**Re:**   Response to Your Self-Query

The enclosed information is released by the National Practitioner Data Bank (NPDB) for restricted use under the provisions of Title IV of Public Law 99-660, the Health Care Quality Improvement Act of 1986, as amended; Section 1921 of the Social Security Act; and Section 1128E of the Social Security Act.

Title IV established the NPDB as an information clearinghouse to collect and release certain information related to malpractice payment history and professional competence or conduct of physicians, dentists, and other licensed health care practitioners.

Section 1921 of the Social Security Act expanded the scope of the NPDB.  Section 1921 was enacted to protect program beneficiaries from unfit health care practitioners, and to improve the anti-fraud provisions of federal and state health care programs. Section 1921 authorizes the NPDB to collect certain adverse actions taken by state licensing and certification authorities, peer review organizations, and private accreditation organizations, as well as final adverse actions taken by state law or fraud enforcement agencies (including, but not limited to, state law enforcement agencies, state Medicaid Fraud Control Units, and state agencies administering or supervising the administration of a state health care program), against health care practitioners, health care entities, providers and suppliers.

Section 1128E of the Social Security Act was added by Section 221(a) of Public Law 104-191, the Health Insurance Portability and Accountability Act of 1996. The statute established a national data collection program (formerly known as the Healthcare Integrity and Protection Data Bank) to combat fraud and abuse in health care delivery and to improve the quality of patient care. Section 1128E information is now collected and disclosed by the NPDB as a result of amendments made by Section 6403 of the Affordable Care Act of 2010, Public Law 111-148.  Section 1128E information includes certain final adverse actions taken by federal agencies and health plans against health care practitioners, providers, and suppliers.

Regulations governing the NPDB are codified at 45 CFR part 60. Responsibility for operating the NPDB resides with the Secretary of the U.S. Department of Health and Human Services (HHS), and HRSA, Division of Practitioner Data Banks.

Reports from the NPDB contain limited summary information and should be used in conjunction with information from other sources in granting privileges, or in making employment, affiliation, contracting or licensure decisions.  NPDB responses may contain more than one report on a particular incident, if two or more actions were taken as a result of a single incident (e.g., an exclusion from a federal or state health care program and an adverse licensure action).  The NPDB is a flagging system, and a report may be included for a variety of reasons that do not necessarily reflect adversely on the professional competence or conduct of the subject named in the report.

The response received from a self-query belongs to the subject of the self-query. Subjects may share the information contained in their own self-query responses with whomever they choose.

If you require additional assistance, visit the NPDB web site (https://www.npdb.hrsa.gov) or contact the NPDB Customer Service Center at 1-800-767-6732 (TDD: 1-703-802-9395).  Information Specialists are available to speak with you weekdays from 8:30 a.m. to 6:00 p.m. (5:30 p.m. on Fridays) Eastern Time.  The NPDB Customer Service Center is closed on all Federal holidays.

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

5500000197074854
Process Date: 02/19/2020
Page: 1 of 1

## DANG, HUNG HUY - SELF-QUERY RESPONSE

### A. SUBJECT IDENTIFICATION INFORMATION (Recipients should verify that subject identified is, in fact, the subject of interest.)

**Practitioner Name:** DANG, HUNG HUY
**Date of Birth:**                                       **Gender:** MALE
**Delivery Address:** 27222 10TH AVE S, DES MOINES, WA 98198-9314
**Social Security Number:**                            **DEA:**
**NPI:** 1538208491
**License:** PHYSICIAN (MD), 60034194, WA, OTOLARYNGOLOGY
**Professional School(s):** UNIVERSITY OF OKLAHOMA COLLEGE OF MEDICINE (2003)

### B. PAYMENT INFORMATION

**Credit Card Information:**
**NPDB Charge:** $4.00           **NPDB Bill Reference Number:** N67465228
**Transaction Date:** 02/19/2020        **Additional Paper Copies Requested:** 0

### C. SUMMARY OF REPORTS ON FILE WITH THE DATA BANK AS OF 02/19/2020

The following report types have been searched:

| | | | |
|---|---|---|---|
| Medical Malpractice Payment Report(s): | No Reports | Health Plan Action(s): | No Reports |
| State Licensure Action(s): | **Yes, See Below** | Professional Society Action(s): | No Reports |
| Exclusion or Debarment Action(s): | No Reports | DEA/Federal Licensure Action(s): | No Reports |
| Government Administrative Action(s): | **Yes, See Below** | Judgment or Conviction Report(s): | No Reports |
| Clinical Privileges Action(s): | No Reports | Peer Review Organization Action(s): | No Reports |

Copies of these reports are enclosed for restricted/limited use as prescribed by statutes listed on the preceding cover page.

---

**HEALTH CARE AUTHORITY (WA STATE MEDICAID)**

**GOVERNMENT ADMINISTRATIVE**
**Basis for Action:** - OTHER, SEE SECTION C. OF THE REPORT FOR DETAILS

| | | |
|---|---|---|
| **Initial Action:** - TERMINATION OF MEDICAID OR OTHER STATE HEALTH CARE PROGRAM PARTICIPATION | **Date of Action:** | 12/26/2017 |
| **DCN:** 5500000132143033 | | |

---

**HEALTH PROFESSIONS QUALITY ASSURANCE**

**STATE LICENSURE**
**Basis for Action:** - NEGLIGENCE - SUBSTANDARD OR INADEQUATE CARE - VIOLATION OF FEDERAL OR STATE STATUTES, REGULATIONS OR RULES

| | | |
|---|---|---|
| **Initial Action:** - LIMITATION OR RESTRICTION ON LICENSE | **Date of Action:** | 10/02/2017 |
| **DCN:** 5500000128176518 | | |

--------------------------- Unabridged Report(s) Follow ---------------------------



NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000132143033
Process Date: 02/27/2018
Page: 1   of   3
DANG, HUNG HUY

## DANG, HUNG HUY

### *HEALTH CARE AUTHORITY (WA STATE MEDICAID)*

| GOVERNMENT ADMINISTRATIVE ACTION | Date of Action: 12/26/2017 |
|---|---|
| **Initial Action** | **Basis for Initial Action** |
| - TERMINATION OF MEDICAID OR OTHER STATE HEALTH CARE PROGRAM PARTICIPATION | - OTHER, SEE SECTION C. OF THE REPORT FOR DETAILS |

**A. REPORTING ENTITY**

| | |
|---|---|
| Entity Name: | HEALTH CARE AUTHORITY (WA STATE MEDICAID) |
| Address: | PO BOX 45530 |
| City, State, Zip: | OLYMPIA, WA 98504-5530 |
| Country: | |
| Name or Office: | QMT - KRISTINA HAWLEY |
| Title or Department: | HEALTH SERVICES AND MANAGEMENT |
| Telephone: | (360) 725-2032 |
| Entity Internal Report Reference: | |
| Type of Report: | INITIAL |

**B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)**

| | |
|---|---|
| Subject Name: | DANG, HUNG HUY |
| Other Name(s) Used: | |
| Gender: | UNKNOWN |
| Date of Birth: | |
| Organization Name: | |
| Work Address: | |
| City, State, ZIP: | |
| Organization Type: | |
| Home Address: | 27222 10TH AVE S |
| City, State, ZIP: | DES MOINES, WA 98198-9314 |
| Deceased: | UNKNOWN |
| Federal Employer Identification Numbers (FEIN): | |
| Social Security Numbers (SSN): | |
| Individual Taxpayer Identification Numbers (ITIN): | |
| National Provider Identifiers (NPI): | |
| Professional School(s) & Year(s) of Graduation: | |
| Occupation/Field of Licensure: | PHYSICIAN (MD) |
| State License Number, State of Licensure: | MD60034194, WA |
| Drug Enforcement Administration (DEA) Numbers: | |
| Unique Physician Identification Numbers (UPIN): | |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | |
| Business Address of Affiliate: | |
| City, State, ZIP: | |
| Nature of Relationship(s): | |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

| | |
|---|---|
| **DCN:** 5500000132143033 | |
| Process Date: 02/27/2018 | |
| Page: 2    of    3 | |
| DANG, HUNG HUY | |

---

| **C. INFORMATION REPORTED** | | |
|---|---|
| Type of Adverse Action: | GOVERNMENT ADMINISTRATIVE |
| Basis for Action: | OTHER UNPROFESSIONAL CONDUCT, SPECIFY (D8) |
| Other, as Specified: | WAC 182-502-0030(1)(A)(III)(VI) AND (XIV) |
| Name of Agency or Program That Took the Adverse Action Specified in This Report: | WA HCA |
| Adverse Action Classification Code(s): | TERMINATION OF MEDICAID OR OTHER STATE HEALTH CARE PROGRAM PARTICIPATION (1551) |
| Date Action Was Taken: | 12/28/2017 |
| Date Action Became Effective: | 12/26/2017 |
| Length of Action: | INDEFINITE |
| Total Amount of Monetary Penalty, Assessment and/or Restitution: | |
| Is Subject Automatically Reinstated After Adverse Action Period Is Completed?: | NO |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | Termination of Washington State Medicaid Contract. |

☐ Subject identified in Section B has appealed the reported adverse action.

---

| **D. SUBJECT STATEMENT** | If the subject identified in Section B of this report has submitted a statement, it appears in this section. |
|---|---|

---

**E. REPORT STATUS**

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements.  No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

Date of Original Submission:        02/27/2018

Date of Most Recent Change:        02/27/2018

---

**This report is maintained under the provisions of:** Section 1921

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Section 1921 of the Social Security Act, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

**DCN:** 5500000132143033
Process Date: 02/27/2018
Page: 3   of   3
DANG, HUNG HUY

**END OF REPORT**

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY



NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

**DCN:** 5500000132143033
Process Date: 02/27/2018
Page: 1   of   1
DANG, HUNG HUY

# DISCLOSURE HISTORY
### Report Number: 5500000132143033

**F. DISCLOSURE
HISTORY**

### Recipient(s) of the Current Version of this Report

A copy of this report has been disclosed to the following entity(entities) for limited/restricted use under the statutory provisions specified in this report.  Additionally, all active entities who received an earlier version of this report within the three year period prior to the date this report was submitted or changed were mailed a copy of the current version.

| Date Released | Entity Name |
|---|---|
| 08/16/2018 | OK STATE BRD  MEDICAL LIC &  SUPERVISION<br>101 NE 51ST ST<br>OKLAHOMA CITY, OK    73105<br>(405) 962-1400 |

| Date Released | Entity Name |
|---|---|
| 01/07/2020 | CASCADE BEHAVIORAL HOSPITAL<br>12844 MILITARY RD S<br>TUKWILA, WA    98168<br>(206) 248-4590 |

| Date Released | Entity Name |
|---|---|
| 02/19/2020 | SELF-QUERIER |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**



NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000128176518
Process Date: 10/05/2017
Page: 1   of   3
DANG, HUNG HUY

## DANG, HUNG HUY

| HEALTH PROFESSIONS QUALITY ASSURANCE | |
| --- | --- |
| **STATE LICENSURE ACTION** | **Date of Action:** 10/02/2017 |
| **Initial Action** | **Basis for Initial Action** |
| - LIMITATION OR RESTRICTION ON LICENSE | - NEGLIGENCE<br>- SUBSTANDARD OR INADEQUATE CARE<br>- VIOLATION OF FEDERAL OR STATE STATUTES, REGULATIONS OR RULES |

**A. REPORTING ENTITY**

| | |
| --- | --- |
| Entity Name: | HEALTH PROFESSIONS QUALITY ASSURANCE |
| Address: | 111 ISRAEL RD SE STOP 47879 |
| City, State, Zip: | TUMWATER, WA 98501-5570 |
| Country: | |
| Name or Office: | SHELLIE CARPENTER |
| Title or Department: | ADJUDICATIVE SERVICE UNIT |
| Telephone: | (360) 236-4674 |
| Entity Internal Report Reference: | |
| Type of Report: | INITIAL |

**B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)**

| | |
| --- | --- |
| Subject Name: | DANG, HUNG HUY |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | �â–ˆâ–ˆâ–ˆâ–ˆ |
| Organization Name: | |
| Work Address: | 27222 10TH AVE S |
| City, State, ZIP: | DES MOINES, WA 98198 |
| Organization Type: | |
| Home Address: | 27222 10TH AVE S |
| City, State, ZIP: | DES MOINES, WA 98198 |
| Deceased: | UNKNOWN |
| Federal Employer Identification Numbers (FEIN): | |
| Social Security Numbers (SSN): | ▄▄▄▄▄ |
| Individual Taxpayer Identification Numbers (ITIN): | |
| National Provider Identifiers (NPI): | |
| Professional School(s) & Year(s) of Graduation: | UNIVERSITY OF OKLAHOMA (1999) |
| Occupation/Field of Licensure: | PHYSICIAN (MD) |
| State License Number, State of Licensure: | MD.MD.60034194, WA |
| Specialty: | OTOLARYNGOLOGY |
| Drug Enforcement Administration (DEA) Numbers: | |
| Unique Physician Identification Numbers (UPIN): | |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | |
| Business Address of Affiliate: | |
| City, State, ZIP: | |
| Nature of Relationship(s): | |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

**DCN:** 5500000128176518
Process Date: 10/05/2017
Page: 2   of   3
DANG, HUNG HUY

| **C. INFORMATION REPORTED** | |
|---|---|
| Type of Adverse Action: | STATE LICENSURE |
| Basis for Action: | NEGLIGENCE (13)<br>SUBSTANDARD OR INADEQUATE CARE (F6)<br>VIOLATION OF FEDERAL OR STATE STATUTES, REGULATIONS OR RULES (A6) |
| Name of Agency or Program That Took the Adverse Action Specified in This Report: | WASHINGTON DEPARTMENT OF HEALTH |
| Adverse Action Classification Code(s): | LIMITATION OR RESTRICTION ON LICENSE (1147) |
| Date Action Was Taken: | 10/02/2017 |
| Date Action Became Effective: | 10/02/2017 |
| Length of Action: | INDEFINITE |
| Total Amount of Monetary Penalty, Assessment and/or Restitution: | $ 5,000.00 |
| Is Subject Automatically Reinstated After Adverse Action Period Is Completed?: | NO |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | RCW 18.130.180(1), (4) and (7). The commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession. Incompetence, negligence, or malpractice which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed; and Violation of any state or federal statute or administrative rule regulating the profession in question, including any statute or rule defining or establishing standards of patient care or professional conduct or practice. |
| Is the Adverse Action Specified in This Report Based on the Subject's Professional Competence or Conduct, Which Adversely Affected, or Could Have Adversely Affected, the Health or Welfare of Patient(s)?: | YES |

☐ Subject identified in Section B has appealed the reported adverse action.

| **D. SUBJECT STATEMENT** | If the subject identified in Section B of this report has submitted a statement, it appears in this section. |
|---|---|

| **E. REPORT STATUS** | Unless a box below is checked, the subject of this report identified in Section B has not contested this report. |
|---|---|

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

**DCN:** 5500000128176518
Process Date: 10/05/2017
Page: 3    of    3
DANG, HUNG HUY

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

Date of Original Submission:          10/05/2017
Date of Most Recent Change:          10/05/2017

**This report is maintained under the provisions of:** Title IV; Section 1921

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended, Section 1921 of the Social Security Act, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

──────────────── **END OF REPORT** ────────────────

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**



NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

**DCN:** 5500000128176518
Process Date: 10/05/2017
Page: 1    of    1
DANG, HUNG HUY

# DISCLOSURE HISTORY
### Report Number: 5500000128176518

**F. DISCLOSURE HISTORY**

## Recipient(s) of the Current Version of this Report

A copy of this report has been disclosed to the following entity(entities) for limited/restricted use under the statutory provisions specified in this report.  Additionally, all active entities who received an earlier version of this report within the three year period prior to the date this report was submitted or changed were mailed a copy of the current version.

| Date Released | Entity Name |
|---|---|
| 10/05/2017 | FRANCISCAN HEALTH SYSTEM |
| | 1717 S J ST STOP 3-21 |
| | TACOMA, WA    98405 |
| | (253) 680-2180 |

| Date Released | Entity Name |
|---|---|
| 10/23/2017 | HEALTH CARE AUTHORITY (WA STATE MEDICAID) |
| | PO BOX 45530 |
| | OLYMPIA, WA    98504 |
| | (360) 725-2032 |

| Date Released | Entity Name |
|---|---|
| 08/16/2018 | OK STATE BRD  MEDICAL LIC &  SUPERVISION |
| | 101 NE 51ST ST |
| | OKLAHOMA CITY, OK    73105 |
| | (405) 962-1400 |

| Date Released | Entity Name |
|---|---|
| 01/07/2020 | CASCADE BEHAVIORAL HOSPITAL |
| | 12844 MILITARY RD S |
| | TUKWILA, WA    98168 |
| | (206) 248-4590 |

| Date Released | Entity Name |
|---|---|
| 02/19/2020 | SELF-QUERIER |